KUHN, J.
 

 |2In this personal injury case arising out of an automobile accident, the plaintiff appeals a judgment rendered pursuant to a jury verdict that found the plaintiff 100% at fault and dismissed with prejudice all claims filed against the defendants. For the following reasons, we reverse and render judgment finding defendants J.B. Hunt Transport, Inc. and Robert Jackson 60% at fault and Brian Shane Brewer 40% at fault for the accident at issue. We award special damages in the amount of $10,677,634.93 and general damages in the amount of $2,500,000.00, to be reduced in proportion to the plaintiffs degree of fault.
 

 FACTS AND PROCEDURAL BACKGROUND
 

 Although the exact facts are in dispute, the automobile accident occurred at approximately 12:51 p.m. on January 13, 2000 on Interstate 1-12 near milepost 11.1 in Livingston Parish. On that date and time, an 18-wheeler tractor-trailer owned by J.B. Hunt Transport, Inc. (J.B. Hunt) and driven by J.B. Hunt employee Robert Jackson and a 1994 Chevrolet pickup truck owned and operated by twenty-three year old Brian Shane Brewer (Brewer) were traveling in an easterly direction on the interstate approaching an area of construction. Robert Jackson was traveling in the right lane of traffic, and Brewer was behind the 18-wheeler in the left lane. In anticipation of the upcoming closure of the right lane of the roadway due to the construction work in progress, Robert Jackson slowed his speed from somewhere between 40-45 miles per hour to approximately 5-8 miles per hour and began to move the 18-wheeler across the solid white lane line into the left lane of traffic. Upon observing the movement of the 18-wheeler ahead, Brewer, who was traveling at interstate highway speed, reacted in two stages. Brewer first made a rightward steering maneuver and then later straightened his wheels before making a hard brake. Despite skidding for approximately 102 feet in the left lane, Brewer | acould not stop his vehicle quickly enough and rear-ended the 18-wheeler. The entire front cab of the Brewer pickup was crushed underneath the 18-wheeler.
 

 The parties provide two vastly different accounts of the accident. Robert Jackson claims that he had substantially completed his lane change and had been stopped for several minutes in the left lane due to traffic ahead before the impact occurred. Robert Jackson maintains that he felt a “horrendous jolt” upon impact and that the loaded 18-wheeler was pushed forward by
 
 *938
 
 the Brewer pickup. Brewer
 
 [1]
 
 , by contrast, claims that the 18-wheeler was in the process of slowing and moving into the left lane of traffic at the time of impact and that the accident occurred in the center of the highway between the two lanes of traffic. Following initial impact, Brewer maintains that the 18-wheeler dragged his pickup forward for approximately 15 feet before the vehicles came to rest.
 

 On August 28, 2000, Brewer
 
 [2]
 
 filed the instant suit against Robert Jackson and his employer, J.B. Hunt, seeking damages for past and future pain and suffering, mental anguish and distress, loss of enjoyment of life, disability, lost earnings and earning capacity, and medical and related expenses. In his petition, Brewer alleged that there is a presumption of fault against Jackson, because he changed lanes without yielding to oncoming traffic. Brewer further alleged that Robert Jackson was negligent in the following particulars: (1) failing to properly check his mirrors and to detect the Brewer vehicle approaching in the left lane at interstate highway speed; (2) failing to properly signal or to signal long enough
 
 in
 
 advance
 
 of his lane
 
 change to put oncoming traffic on notice; (3) waiting until his |4own speed and momentum were depleted before trying to change lanes; and (4) failing to obsérve from his high vantage point that traffic ahead was stopping so as to make the lane change at an appropriate speed or else to wait until motorists in the left lane of traffic created an opening to let him into that lane.
 
 [3]
 
 Robert Jackson and J.B. Hunt filed separate answers to the suit, denying the allegations against them. Alternatively, in the event that they were found liable, Robert Jackson and J.B. Hunt asserted the affirmative defense of comparative fault on the part of Brewer.
 

 The matter was tried before a jury on January 9-26, 2006. Following'presentation of the evidence and arguments, the jury returned a verdict in favor of the defendants, finding that the plaintiff was 100% at fault for the accident. On February 16, 2006, the trial court rendered judgment in accordance with the jury’s findings and dismissed with prejudice all claims filed against the defendants.
 

 
 *939
 
 On March 6, 2006, Brewer filed a motion for judgment notwithstanding the verdict or, alternatively, for new trial as to the claims against J.B. Hunt and Robert Jackson. Therein, Brewer alleged that the undeniable, objective physical evidence established that Robert Jackson had not completed his lane change when he collided with the Brewer pickup and, therefore, that there was a presumption that Jackson was at fault. Following a hearing, on August 7, 2006, the trial court signed a judgment denying the motions for judgment notwithstanding the verdict and for new trial.
 

 | ¡¡Thereafter, on August 11, 2006, Brewer filed this devolutive appeal, wherein he has asserted three primary assignments of error. First, Brewer avers that the trial court erred in allowing the introduction of evidence at trial as to his pre-accident illicit drug use and arrests without conviction. Second, Brewer argues that the trial court erred in refusing to instruct the jury that a motorist changing lanes on a multi-lane highway has a duty to use a signal to alert following vehicles and by giving the jury a rear-end fault instruction without qualifying that such presumption is not available to the driver of a vehicle that changes lanes into the path of another vehicle. Third, based on the evidence and testimony presented at trial, Brewer submits that the judge and jury erred in concluding that Robert Jackson and J.B. Hunt were free from fault in the accident.
 

 DISCUSSION AND ANALYSIS
 

 It is well-settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of manifest error or unless it is clearly wrong.
 
 Rosell v. ESCO,
 
 549 So.2d 840, 844 (La.1989). Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.
 
 Johnson v. State Farm Mut. Auto. Ins. Co.,
 
 95-1027, p. 3-4 (La.App. 5 Cir. 5/15/96), 675 So.2d 1161, 1162-1163; Arc
 
 eneaux v. Domingue,
 
 365 So.2d 1330, 1333 (La.1978). The issue to be resolved by the reviewing court is not whether the fact finder was right or wrong, but whether his conclusion was a reasonable one.
 
 Stobart v. State Through Dept. of Transp. and Dev.,
 
 617 So.2d 880, 882 (La.1993). Thus, where two permissible views of the evidence exist, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong.
 
 Id.
 
 at 883. However, when one or more trial court legal errors interdict the fact-finding process, the manifest error | (¡standard is no longer applicable and, if the record is complete, the appellate court should conduct its own independent
 
 de novo
 
 review of the record.
 
 Evans v. Lungrin,
 
 97-0541, 97-0577, p. 6-7 (La.2/6/98), 708 So.2d 731, 735;
 
 McLean v. Hunter,
 
 495 So.2d 1298, 1304 (La.1986). Since a determination of the propriety of the trial court’s evidentiary ruling and jury instructions governs the standard of review to be applied to the factual findings herein, we will address those two assignments of error first before considering the jury’s allocation of fault.
 

 Jury Instructions
 

 (Assignment of Error Two)
 

 Brewer challenges the propriety of the trial court’s jury instructions on two grounds. First, Brewer argues that the trial court erred in instructing the jury that there is a presumption of fault against a rear-ending vehicle under La. R.S. 32:81, because the rear-end presumption does not apply in a lane change case. Second, once the trial court improperly instructed the
 
 *940
 
 jury as to the rear-end presumption, Brewer submits that the court erred by refusing to give an instruction that a motorist changing lanes on a multi-lane highway has a duty under La. R.S. 82:104 to use a turn signal to alert following vehicles as to his movement. Based on the alleged deficiencies, Brewer submits that the jury instructions were biased in favor of J.B. Hunt and Robert Jackson.
 

 When examining the lengthy instructions given the jury in this case, however, it is clear that the trial court gave instruction as to the rights and duties of both motorists involved in the accident. Specifically, with respect to Robert Jackson, the jury was instructed as follows:
 

 A motorist who attempts to change lanes on a multiple lane highway must ascertain before turning that the maneuver can be made safely without endangering normal overtaking or oncoming traffic. The greater burden of care is required for the motorist changing lanes [than] is demanded of a driver proceeding at a lawful rate on a straight line in a marked lane. Moreover, when there is a change of lanes by a motorist immediately preceding an accident the burden of proof is on the motorist changing lanes to show that it first ascertained that his 17movement could be made safely. A presumption of negligence arises when a defendant motorist leaves his own traffic lane and strikes another vehicle. In such a case, the burden of proof on such a defendant motorist is to show he was not guilty of any dereliction or fault however slight.
 

 With respect to Brewer, the jury was instructed as follows:
 

 When a following driver rear ends the vehicle in front of him, the following driver is presumed to be at fault and must prove a lack of fault in order to avoid liability. In order to prove that he was not at fault the following driver must show that he kept his vehicle under control, watched the vehicle in front of him closely, keeping a safe distance, or that the lead driver created a hazard which he could not reasonably avoid. A following driver may assume that the lead vehicle will be driven carefully. And the following driver is not negligent when he unavoidably collides with the lead vehicle brought to a sudden and unforeseeable stop in his immediate path. Professional truck drivers have a capacity superior to that of the ordinary car driver.
 

 Based on those instructions and the evidence of record, it was the jury’s duty to determine which presumption of fault was applicable or overriding and, in turn, which party or parties were ultimately at fault for the accident.
 

 When assessing an alleged erroneous jury instruction, it is the duty of the reviewing court to evaluate such impropriety in light of the entire jury charge to determine if it adequately provides the correct principles of law as applied to the issues and whether they adequately guided the jury in its deliberation.
 
 Shilling ex rel. Shilling v. State ex rel. Dept. of Transp. and Dev.,
 
 2005-0172, p. 9 (La.App. 1 Cir. 12/22/05), 928 So.2d 95, 101,
 
 writ denied,
 
 2006-0151 (La.4/24/06), 926 So.2d 541;
 
 Duzon v. Stallworth,
 
 2001-1187, p. 27 (La.App. 1 Cir. 12/11/02), 866 So.2d 887, 858,
 
 writs denied,
 
 2003-0589, 2003-0605 (La.5/2/03), 842 So.2d 1101, 1110. An appellate court must exercise great restraint before overturning a jury verdict on the suggestion that the jury instructions were so erroneous as to be prejudicial.
 
 Shilling,
 
 928 So.2d at 101;
 
 Bell v. Whitten,
 
 97-2359, p. 7 (La.App. 1 Cir. 11/6/98), 722 So.2d 1057,1061.
 

 | RIn this case, there were factual issues raised at trial as to the liability of
 
 *941
 
 both drivers. Questions were raised as to whether Robert Jackson had completed his lane change at the time of impact and whether Brewer was alert and attentive and proceeding at a lawful rate of speed. Given those issues of fact, we believe that the trial court properly instructed the jury as to the legal presumptions that potentially weighed in favor of and against each of the drivers. The trial court addressed the various presumptions under the law so that the jury could make its own determination of which presumption of fault was applicable and which party or parties were liable under the unique facts and circumstances of this case. A full reading of the jury instructions reveals that they were complete and free from bias and did not prejudice the jury against either party. Thus, we find no merit to Brewer’s second assignment of error, and we will now direct our attention to the trial court’s evi-dentiary rulings.
 
 [4]
 

 Evidence of Prior Bad Acts
 

 (Assignment of Error One)
 

 Brewer argues that the trial court made an erroneous evidentiary ruling in allowing the defendants, after opening statements and the presentation of most of plaintiffs case-in-chief, to introduce evidence related to his illicit drug use and arrests without conviction prior to the accident. In making this ruling, the trial court impliedly reversed a pre-trial judgment signed on October 24, 2005, which granted Brewer’s motion in
 
 limine
 
 and prohibited evidence of the use of illicit drugs both before and after the accident and excluding evidence of any arrests, Rcrimes, or wrongs not shown by certified court records to have resulted in felony convictions within the last ten years after Brewer ceased to be a juvenile.
 
 [5]
 

 In oral reasons for the ruling, the trial court judge pointed out that Brewer’s mother, Kimberly Porche, testified on direct examination that her son is not the same person now as he was before his accident.
 
 [6]
 
 Prior to January 13, 2000, Mrs. Porche stated that her son was a “happy,” “normal kid” with lots of friends and a good work history. After the accident, Mrs. Porche testified that Brewer began to associate with unsavory individuals, who prey on him for his medications and pocket money. Mrs. Porche further testified that Brewer now often screams at his parents and exhibits rage and violence and that there has never been a time subsequent to the accident that he has not exhibited behavioral problems. In light of Mrs. Porche’s glowing characterization of Brewer before the accident, the trial judge concluded that Brewer opened the door for limited testimony regarding pre-accident crimes, wrongs, or bad acts and that the probative value of such evidence was not outweighed by any potential prejudice.
 

 
 *942
 
 Accordingly, on cross examination, defense counsel questioned Mrs. Porche about certain employment and legal troubles experienced by her son prior to his accident. Upon inquiry, Mrs. Porche admitted that Brewer was fired by one employer and criminally charged less than two years before the accident for allegedly stealing copper wire from a jobsite. Also, Mrs. Porche confirmed that Brewer was previously arrested in another unrelated incident for possession of Gamma Hydroxy Butyrate or “GHB.” Although the possession charge was | inultimately dropped, Mrs. Porche testified that Brewer did serve approximately 2-3 months in East Baton Rouge Parish Prison for contempt of court upon failing a court ordered drug test in conjunction with the possession charge.
 

 On appeal, Brewer argues that the trial court’s ruling that his character was a legitimate object of consideration for the jury in this civil case was erroneous, because character evidence under La.Code Evid. art. 608 is only admissible to attack or support credibility and, even then, inquiry as to particular acts, vices, or courses of conduct should not be made. However, even if otherwise admissible, Brewer argues that such evidence was irrelevant and unduly prejudicial and, therefore, should have been excluded. In opposition, J.B. Hunt and Robert Jackson argue that Brewer opened the door to otherwise inadmissible evidence of prior bad acts by introducing character testimony, through witness Kimberly Porche, which was untrue.
 

 Louisiana Code of Evidence Article 607(C) provides that, “[ejxcept as otherwise provided by legislation, a party, to attack the credibility of a witness, may examine him concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony.” Louisiana Code of Evidence Article 608(C) provides that “[a] witness who has testified to the character for truthfulness or untruthfulness of another witness may be cross-examined as to whether he has heard about particular acts of that witness bearing upon his credibility.” Although Articles 607 and 608 generally permit a party to attack the credibility of a witness by examining him concerning any matter having a reasonable tendency to disprove the truthfulness of his testimony, this grant is necessarily subject to the relevancy balance of La.Code Evid. art. 403.
 
 State v. Meshell,
 
 567 So.2d 1181, 1184 (La.App. 3 Cir.1990),
 
 writ denied,
 
 572 So.2d 87 (La. 1991).
 

 “ ‘Relevant evidence’ means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more | ¶1 probable or less probable than it would be without the evidence.” La.Code Evid. art. 401. As a general rule, “all relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, th[e] Code of Evidence, or other legislation.” La.Code Evid. art. 402. “Evidence which is not relevant is not admissible.”
 
 Id,.
 
 Also, “[ajlthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.” La. Code Evid. art. 403.
 

 Although the evidence of prior “bad acts” was purportedly introduced for the purposes of quantum, the references improperly and irrelevantly went beyond that purpose. It is undisputed that Brewer was not on drugs or alcohol at the time of the accident, and J.B. Hunt and Jackson have stipulated that that there is no evidence that Brewer’s pre-accident drug use
 
 *943
 
 caused his brain injury. Thus, given those facts, the primary issue was whether Robert Jackson acted negligently and was a cause in fact, either in whole or in part, of the accident and the resultant injuries sustained by Brewer. Our courts do not punish individuals by refusing recovery for loss ... because they had problems with the law.
 
 Thomasie v. Lee,
 
 97-397, p. 9 (La.App. 5 Cir. 9/30/97), 700 So.2d 580, 584. Likewise, we do not believe that a single, isolated instance of termination from employment is indicative of Brewer’s future employment potential. Thus, we find that the testimony relating to Brewer’s prior drug use and arrests was irrelevant and, therefore, inadmissible.
 

 Even if we were to find that the evidence of the prior drug use and arrests was relevant to the issue of quantum, a notion which we reject, we note that any potential probative value would nonetheless be outweighed by danger of unfair prejudice, confusion of the issues, or misleading the jury. Although defense counsel elicited testimony that Brewer had been arrested for possession of GHB, a substance commonly referred to as the “date rape” drug, the jury, which was [ ^comprised of eleven women and only one man, was never instructed that his arrest stemmed from his own alleged consumption of the drug with several other boys outside a nightclub. The effect of such testimony, without clarification, was unduly prejudicial.
 

 Also, by introducing evidence as to Brewer’s illicit drug use and arrests, defense counsel misled the jury and confused the issues of liability and damages. This overlapping of issues, whether intentional or not, is apparent in closing arguments, when defense counsel, after addressing the prior bad acts, returned to the issue of liability. By intermingling the issues of liability and quantum, defense counsel misled the jury. Once the jury was tainted by defense counsel’s characterization of Brewer as a “bad seed,” the fact-finding process was interdicted, making it difficult, if not impossible, for the jury to make a fair and impartial determination of liability.
 
 [7]
 

 Notably, we find that this case is distinguishable from
 
 O’Neal v. Church’s Fried Chicken, Inc.,
 
 580 So.2d 706 (La.App. 4 Cir.1991), which was cited by the defendants and relied upon by the lower court in reversing its pre-trial grant of Brewer’s motion in
 
 limine
 
 and allowing evidence as to the plaintiffs prior bad acts. In
 
 O’Neal,
 
 the plaintiff brought suit against a restaurant for the wrongful death of her son at the hands of a restaurant employee which occurred while the decedent was attempting an armed robbery of the business. On appeal following rendition of judgment on a jury verdict denying the plaintiffs claim for damages, the plaintiff argued that the restaurant’s reference at trial to her son’s twenty-one arrests constituted reversible error, because it put the decedent’s character at issue. In considering that assignment of error, the Louisiana Fourth Circuit Court of 113Appeal reasoned that when a petitioner makes a claim for damages for loss of love and affection and companionship by reason of the death of a son, evidence that would show the gravity and nature of the loss of a loved one is admissible. Thus, in that ease, the appellate court held that the plaintiffs witnesses were
 
 *944
 
 permitted to testify that he was a “good boy” and a “kind, well respected individual.” 580 So.2d at 708. Although the nature of that evidence may be closely akin to character evidence, the appellate court explained that it is not the same.
 
 Id.
 
 Character evidence relates to reputation of witnesses and their credibility, or lack thereof.
 
 Id. citing
 
 La.Code Evid. art. 608. But once evidence was introduced to show loss of love, affection and companionship, the defense could certainly cross-examine witnesses to show otherwise.
 
 Id.
 
 Therefore, the appellate court concluded that cross-examination that produced evidence showing a lack of love, affection, and companionship was certainly admissible.
 
 Id.
 

 A key distinguishing factor of the case at hand is that, unlike in
 
 O’Neal,
 
 Brewer’s mother has not asserted any personal claims for damages. The entirety of the claims in this case belongs to the accident victim, Brewer, and there are no derivative consortium claims. Thus, evidence as to loss of love and affection is not relevant. Moreover, since Brewer has alleged at all pertinent times that he incurred a significant brain injury, the lower court and defense counsel should have anticipated that he would introduce evidence related to his mental impairment and resultant personality change at trial. The testimony elicited on cross-examination of Mrs. Porche related to pre-accident drug use and arrests does not change the fact that Brewer suffered a severe injury and, therefore, should not have been introduced to the jury.
 

 The trial court’s error was compounded herein by the fact that the lower court changed the evidentiary rules mid-trial. In accordance with the trial court’s pretrial evidentiary ruling, Brewer’s counsel made no mention of pre-accident |udrug use and arrests during opening arguments and direct examination of his primary witness, Kimberly Porche. Then, after direct examination of Mrs. Porche, the trial court changed the evidentiary rules and allowed defense counsel for the first time to introduce evidence related to Brewer’s pre-acci-dent drug use and arrests. The effect was to prejudice Brewer’s counsel and witness and to give the appearance that they were hiding information from the jury.
 

 For the foregoing reasons, we find that the trial court committed error in allowing the jury to hear references to Brewer’s prior bad acts which were irrelevant to the accident at issue. The error by the trial court prejudiced the jury in answering, not a mere collateral question, but the question which was the crux of the case, specifically whether J.B. Hunt and Robert Jackson were at any degree of fault for the accident.
 
 [8]
 
 Insofar as the trial court’s legal error interdicted the factfinding process, we cannot give any deference to the factual findings and credibility determinations made by the jury. We will, therefore, undertake a
 
 de novo
 
 review of the record to determine liability and, if necessary, damages.
 
 See Sevario v. State ex rel Dept. of Transp. and Dev.,
 
 98-1302, pp. 12-13 (La.App. 1 Cir. 11/10/99), 752 So.2d 221, 230-231,
 
 writ denied,
 
 99-3457 (La.4/7/00), 759 So.2d 760,
 
 writ not consid
 
 
 *945
 

 ered,
 
 99-3638 (La.4/7/00), 759 So.2d 81,
 
 writ not considered,
 
 2000-0044 (La.4/7/00), 759 So.2d 82.
 

 Allocation of Fault
 

 (Assignment of Error Three)
 

 Both Brewer and the defendants advance a version of events that result in a rear impact, but place liability on the opposing party. J.B. Hunt and Robert Jackson contend that the accident was the sole fault of Brewer and allege that | lsBrewer rear-ended the 18-wheeler after it had completed its lane change and was stopped in the left lane of traffic. Brewer, by contrast, alleges that the accident occurred during the course of the lane change. Brewer avers that the accident was precipitated by Robert Jackson, who failed to properly signal in advance of his lane change so as to put oncoming traffic on notice and failed to observe from his high vantage point that traffic ahead was stopping so as to make the lane change at an appropriate time, place, and speed.
 

 To prevail on a negligence claim, the plaintiff must satisfy the duty/risk analysis by proving that: (1) the defendant had a duty to conform to his conduct to a specific standard, (2) the defendant breached the duty by failing to conform his conduct to the appropriate standard, (3) the defendant’s substandard conduct was a eause-in-faet of the plaintiffs injuries, and (4) the defendant’s conduct was the legal cause of the plaintiffs injuries.
 
 Roberts v. Benoit,
 
 605 So.2d 1032, 1051 (La.9/9/91)(on rehearing). Furthermore, in order to recover, the plaintiff must prove the existence of actual damages.
 
 Id.
 

 The existence or a lack of a duty is a question of law.
 
 Laborde v. Scottsdale Ins. Co.,
 
 96-1659, p. 6 (La.App. 3 Cir. 10/22/97), 704 So.2d 247, 251,
 
 writ denied,
 
 98-0471 (La.4/3/98), 717 So.2d 1131,
 
 reconsideration, denied,
 
 98-0471 (La.5/15/98), 719 So.2d 66;
 
 Yocum v. City of Minden,
 
 26,424, p. 3 (La.App. 2 Cir. 1/25/95), 649 So.2d 129, 131. Simply put, the inquiry is whether the plaintiff has any law, whether statutory, jurisprudential, or arising from general principles of fault, to support his claim.
 
 Paul v. La. State Employees’ Group Benefit Program,
 
 99-0897, p. 9 (La.App. 1 Cir. 5/12/00), 762 So.2d 136, 143.
 

 A well-established presumption exists that, in a rear-end collision, the following driver breached the standard of care set out in La. R.S. 32:81.
 
 Mart v. Hill,
 
 505 So.2d 1120, 1123 (La.1987). Louisiana Revised Statutes 32:81(A) states:
 

 |UiThe driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicle and the traffic upon and the condition of the highway.
 

 In a rear-end collision, therefore, the following motorist is presumed negligent unless he proves lack of fault.
 
 Taylor v. Voigtlander,
 
 36, 670, p. 4 (La.App. 2 Cir. 12/11/02), 833 So.2d 1204, 1206. When this presumption applies, to escape liability, the following motorist has the burden to prove that he had his vehicle under control, closely observed the lead vehicle and followed at a safe distance, or that the lead vehicle negligently created a hazard which the following vehicle could not reasonably avoid.
 
 Id.
 

 Louisiana jurisprudence, however, recognizes an exception to the rule that a following motorist is presumed liable for a rear-end collision when the driver of the preceding vehicle “negligently creates a hazard which the following vehicle cannot reasonably avoid.”
 
 Slocum v. Am. Cas. Ins. Co.,
 
 189 So.2d 299, 301 (La.App. 3 Cir.1966) (citations omitted). Louisiana Revised Statutes 32:79(1), relative to driv
 
 *946
 
 ing on roadways laned for traffic, provides in pertinent part, as follows:
 

 A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.
 

 Likewise, La. R.S. 32:104, dealing with turning movements and required signals, provides in pertinent part, as follows:
 

 A. No person shall ... otherwise turn a vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety.
 

 [[Image here]]
 

 D. The signals provided for in R.S. 32:105(B) [signal lamps] shall be used to indicate an intention to turn, change lanes or start from a parked position ...
 

 Under the law, a motorist attempting to make a lane change on a multiple-lane highway is required to determine “that the maneuver can be made safely without 117endangering normal overtaking or oncoming traffic” before attempting the lane change.
 
 Averna v. Indus. Fabrication & Marine Serv., Inc.,
 
 562 So.2d 1157, 1161 (La.App. 4 Cir.1990). Also, there is a statutory duty to use a turn signal when changing lanes.
 

 A motorist changing lanes, like Robert Jackson in the instant case, is held to a greater burden of care than is a motorist like Brewer proceeding on a straight line in a marked lane at a lawful rate.
 
 Averna,
 
 562 So.2d at 1161;
 
 Canzoneri v. Connecticut Fire Ins. Co. of Hartford,
 
 163 So.2d 834, 837-38 (La.App. 4 Cir.1964). A driver changing lanes without first determining that the move can be completed safely and then is struck from the rear by a following car, cannot rely on the rear-end collision presumption to shift the burden to the following driver.
 
 Daigle v. Mumphrey,
 
 96-1891, pp. 5-6 (La.App. 4 Cir. 3/12/97), 691 So.2d 260, 263;
 
 Anthony v. State Farm Mut. Ins. Co.,
 
 227 So.2d 180, 183 (La.App. 2 Cir.1969).
 

 Based on our
 
 de novo
 
 review of the record, and on the basis of the above legal principles, we find that Robert Jackson acted negligently in attempting to make a lane change across the solid white lane line, which requires extreme care or caution.
 
 [9]
 
 Robert Jackson himself admitted that he drastically slowed his speed once he began to move the 18-wheeler across the lane line into the left lane of traffic. Despite Robert Jackson’s assertion to the contrary, none of the eyewitnesses recalled that the 18-wheeler’s left turn signal was activated either before or during the lane change. Also, Robert Jackson did not recall checking hisj^left mirror in the three seconds prior to the accident and testified that he did not ever see the Brewer pickup before the collision. Robert Jackson acted without regard to following vehicles, and his acts and omissions made it difficult for other motorists to anticipate the speed and path of the 18-wheeler.
 

 Moreover, we find that Robert Jackson had not completed his lane change at the time of impact. Defense expert Bland Stephen “Steve” Jackson gave uncontradicted testimony that it was not possible, in light of the physical evidence of glass and gouge marks, that the 18-wheeler was stopped at
 
 *947
 
 impact. Consistent with Steve Jackson’s testimony, the police photos taken at the scene of the accident clearly show that the 18-wheeler was angled toward the left lane, with the right rear tire of the tractor on or close to the lane line and the right rear portion of the trailer still in the right lane. The entire front cab of the Brewer pickup was crushed underneath the 18-wheeler, and the rear of the pickup was straddling the lane line but angled to the left.
 

 By blocking both lanes of traffic, Robert Jackson created a hazardous situation for approaching vehicles. Such action was contrary to the training that he received as a professional truck driver. Specifically, Robert Jackson testified that he was taught that he should never operate his truck in a manner that requires other motorists to adjust to him. With respect to lane changes, Jackson admitted that he was advised during his training that he should only commence a lane change when he has enough space and momentum to complete the maneuver.
 

 In this instance, Robert Jackson disregarded his training and created a situation which required other motorists to react to his movement. Indeed, eyewitness Mark Moreno, who was traveling just behind the Brewer pickup in the right lane of traffic, testified that he only narrowly avoided impact with the J.B. Hunt 18-wheeler by swerving onto the right shoulder of the roadway. Insofar as Robert Jackson indicated that there was a distance of approximately 300 feetJjcjbetween the lane change and the closure of the right lane of traffic, he could have avoided this situation by waiting to make his lane change at a more opportune time and place.
 
 [10]
 
 We note that the duty of care imposed on a motorist changing lanes was intended to prevent exactly this type of accident. Given these facts and circumstances, we find that Robert Jackson was a cause-in-fact of the accident.
 

 Notwithstanding Robert Jackson’s negligence, we also find that Brewer was negligent for failing to keep a proper lookout and to timely react.
 
 [11]
 
 Although Brewer initially made a rightward steering maneuver in response to the movement of the 18-wheeler, Brewer failed to anticipate that the 18-wheeler would slow its speed and would not be able to completely move into the left lane before being stopped by traffic ahead caused by the merging of the two lanes of traffic. Accordingly, Brewer failed to timely apply his brakes. Eyewitnesses Amy and Shelton LeBlanc, who were traveling behind Brewer in the left lane of traffic, testified that Brewer applied his brakes only seconds before the impact. The risk of a rear-end collision is clearly within the scope of the statutory duty to keep a proper lookout. Brewer’s negligence, therefore, was also a cause-in-fact of the accident.
 

 |p,nHaving found both motorists negligent, we turn to the matter of apportionment of fault.
 
 [12]
 
 In allocating fault between the parties, we are guided by the factors set forth by the Louisiana Supreme Court in
 
 Watson v. State Farm Fire &
 
 
 *948
 

 Cas. Ins. Co.,
 
 469 So.2d 967 (La.1985). In
 
 Watson,
 
 the court provided that a number of factors may influence the respective degrees of fault:
 

 ... the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damages claimed.
 

 In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct results from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as the last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
 

 Watson,
 
 469 So.2d at 974.
 

 Applying the
 
 Watson
 
 factors, we conclude that Brewer, albeit a contributing factor, was not the primary cause of the accident. He was plainly unaware of the danger and was merely inattentive. Robert Jackson, by contrast, had the ability to discern from his high vantage point that he could safely and promptly complete his lane change before crossing over the lane line. The magnitude of the risk created by the 18-wheeler driven by Robert Jackson and the careless manner in which he attempted to merge into Brewer’s lane; his knowledge as a professional truck
 
 12\
 
 driver of the danger involved in lane changes, especially across a solid white lane line; his greater experience and training; and the magnitude of the harm created all suggest that J.B. Hunt and Jackson should bear a greater degree of liability. Accordingly, we assign 60% fault to Robert Jackson and J.B. Hunt and 40% fault to Brewer.
 

 Assessment of Damages
 

 Having found the defendants bear comparative fault for the accident, we must now determine quantum. Brewer has made claims for various items of damages, each of which we will address individually.
 
 [13]
 

 Past Medical Expenses and Attendant Care
 

 Following the accident, Brewer was initially treated at Our Lady of the
 
 *949
 
 Lake Hospital in Baton Rouge. Upon presentation, Brewer’s primary diagnosis was traumatic subarachnoid brain hemorrhage with injury to the anterior temporal lobe. His secondary diagnoses included: right femur fracture; spleen capsular tear; post-traumatic pulmonary insufficiency; open eye wound; dislocated finger; open cheek wound; hypotension; 2 tears to the colon; finger joint fracture; left elbow fracture; nose fractures; and more than fifty facial fractures.
 

 Upon arrival at the hospital, Brewer was in a comatose state, which condition persisted for a period of approximately thirty days and necessitated the assistance of an artificial ventilator and feeding tube. During his stay at the hospital, Brewer underwent fifteen separate surgical procedures, including the repair of multiple facial fractures, the removal of his spleen, the repair of the lacerations to his colon, and the reconstruction of his left elbow and right hip.
 

 | ^Following his release from Our Lady of the Lake on February 14, 2000, Brewer was transferred to HealthSouth Rehabilitation Hospital and was admitted for inpatient treatment at that facility’s traumatic brain injury program. Brewer was not discharged from the rehabilitation hospital until April 6, 2000, almost three months after the accident.
 

 Thereafter, Brewer underwent several additional surgeries related to his accident-induced injuries, including a procedure performed at the Mayo Clinic in Minnesota to remove the heterotopic ossification in his left elbow. Prior to trial, Brewer required ongoing neurological and psychological care as a result of his brain injury and was temporarily readmitted to a behavioral hospital in December 2004. Brewer required periodic hospitalization as well due to problems with his medications.
 

 At trial, Brewer’s past medical bills, along with a recapitulation totaling $463,747.93, were filed into evidence. J.B. Hunt and Robert Jackson made no effort to dispute the nature and validity of those charges. Given the proven extent of his injuries, we award Brewer the full amount of $463,747.93 for past medical expenses.
 

 In awarding damages for past medical expenses, we also must consider Brewer’s separate claim for the value of care rendered by his relatives. In support of his claim for attendant care, Brewer relied on the testimony of his mother. Mrs. Porche testified that she and her husband have cared for Brewer continuously since the accident, which task includes personal care as well as management of his affairs, prescription drugs, and medical appointments. Mrs. Porche further testified that in the last eight months prior to trial, Brewer’s increased behavioral problems required that he be monitored 24 hours per day.
 

 With respect to valuation of the services rendered, Brewer submitted the testimony of licensed rehabilitation and professional counselor Robert Gisclair. | g¡Mr. Gisclair testified that the cost of attendant care by a licensed practical nurse ranges from $12.00 to $15.00 per hour. Using Mr. Gis-elair’s figures, Brewer suggests that this court award him the sum of $147,537.00, which represents the costs of care by a licensed practical nurse at a midpoint rate of $13.50 per hour for five hours per day for the time period prior to trial.
 

 Generally speaking, an injured person may recover in his damage claim the value of custodial and nursing services and other care rendered to him for free by his relatives that were made necessary by the fault of the defendant.
 
 Tanner v. Fireman’s Fund Ins. Companies,
 
 589 So.2d 507, 515-516 (La.App. 1 Cir.1991),
 
 writs denied,
 
 590 So.2d 1207 (La.1992);
 
 *950
 

 Bordelon v. Aetna Cas. & Surety Co.,
 
 494 So.2d 1283, 1289 (La.App. 2 Cir.1986). However, the courts have held that a claim for sitting expenses rendered gratuitously by nonprofessional family members without a doctor’s orders must be viewed with close scrutiny.
 
 Bordelon,
 
 494 So.2d at 1289. The need for the services must be shown, the reasonableness of the fee must be established, and the extent and duration of the services must be proven.
 
 Id.
 

 We find that Brewer met his burden of proof herein, because the testimony unequivocally shows that he required supervision at a minimum of five hours per day for the duration of the time prior to trial. However, we note that the care provided by Brewer’s mother and stepfather was not the equivalent of professional healthcare. In that light, we find relevant testimony by Mr. Gisclair that the cost of a sitter ranges from $9.00 to $12.00 per hour, which is lower than the range cited by Brewer for a licensed practical nurse. Accordingly, in consideration of the lower rates for sitters, we award Brewer the sum of $100,000.00 for past attendant care rendered by his family prior to trial.
 

 I^Future Medical Care
 

 Brewer also seeks reimbursement for future medical care. In support of that claim, Brewer once again submitted the testimony of licensed rehabilitation and professional counselor and certified life care planner, Robert Gisclair. Based on his evaluation of Brewer and consultations with his treating physicians, Mr. Gisclair recommended long-term treatment at a residential brain injury facility. Mr. Gis-clair’s recommendation that Brewer seek treatment at a residential brain injury facility was endorsed in writing in letters provided to him by Brewer’s treating physicians, including: Dr. John Olson, neurologist; Dr. Gregory Ward, rehabilitation medicine specialist; Dr. Ashwin Sura, psychiatrist; and Dr. Robert Davis, neuropsy-chologist.
 
 [14]
 

 Based on his recommendation, Mr. Gis-clair prepared a life care plan, which contemplated permanent treatment at one of two facilities, namely: the Centre for Neu-roskills in Irving, Texas, and the Neurological Rehabilitation Living Centers in Covington, Louisiana. Dependent of the degree of supervision required, Mr. Gis-clair testified that the range of costs for the Centre for Neuroskills is between $233.00 and $704.00 per day and that the range of costs for the Neurological Rehabilitation Living Centers is between $312.00 and $875.00 per day. Mr. Gisclair opined that although Brewer would initially require maximum supervision at a higher cost, he would likely achieve some improvement and would eventually level off at a median price range.
 

 Based on Mr. Gisclair’s life care plan, Brewer seeks the sum of $16,425,000.00 for lifelong treatment at the Neurological Rehabilitation Living |2flCenters in Coving-ton.
 
 [15]
 
 Brewer’s calculation is based on a rate of $450 per day, which is $143.50 per day lower than the actual midpoint of that facility’s price range, and an estimated life expectancy of 47.1 years.
 
 [16]
 
 The calculation
 
 *951
 
 also takes into account price inflation of 7.8% per year for healthcare costs and a discount of 4.5% for present value.
 

 Also, Brewer seeks damages for future prescription drug costs. In the life care plan, Mr. Gisclair identified prescription costs in the amount of $41,432.00 per year based on Brewer’s current prescription needs and the indications for use of each medicine identified.
 
 [17]
 
 Once again considering price inflation at a rate of 7.3% per year and a discount rate of 4.5% for present value, Brewer submits that the total cost for future prescription medications is $3,904,020.00.
 
 [18]
 

 Lastly, Brewer seeks damages for outside future medical care and miscellaneous one-time healthcare costs. In the life care plan, Mr. Gisclair accounted for continued care by Brewer’s current treating physicians, namely Drs. Olson (neurologist), Clark (pain management specialist), and Sura (psychiatrist), at a cost of $3,300.00 per year. Based on a straightforward application of those costs |2fito his life expectancy, Brewer now submits that he is entitled to the sum of $155,430.00 for future doctor visits and counseling. Additionally, Mr. Gisclair’s plan estimated one-time medical costs in the sum of $24,125.00, which included $14,000.00 for the initial residential head injury program evaluation
 
 [19]
 
 and $10,125.00 for the costs of a limited five-year care plan for monitoring his rehabilitation needs by physiatrist Dr. John Ward.
 
 [20]
 

 Generally, in order to recover for medical expenses, the appellate record must establish that future medical expenses will be necessary and inevitable.
 
 Richard v. St. Paul Fire and, Marine Ins. Co.,
 
 94-2112, p. 10-11 (La.App. 1 Cir. 6/23/95), 657 So.2d 1087, 1093. An award for future medical expenses will not be supported in the absence of medical testimony that they are indicated and setting out probable cost.
 
 Rhodes v. State Through Dept. of Transp. and Dev.,
 
 94-1758, p. 21 (La.App. 1 Cir. 12/20/96), 684 So.2d 1134, 1148,
 
 unit not considered,
 
 97-0242 (La.2/7/97), 688 So.2d 487. Nevertheless, when the record establishes that fu ture medical expenses will be necessary and inevitable, courts should not reject the award because the record does not provide the exact value, if the court can determine from the record, past medical expenses, and other evidence a minimum amount that reasonable minds could not disagree would be required.
 
 Stiles v. K Mart Corp.,
 
 597 So.2d 1012, 1013 (La.l992)(per curiam);
 
 Levy v. Bayou Indus. Maint. Serv., Inc.,
 
 2003-0037, p. 9 (La.App. 1 Cir.
 
 *952
 
 9/26/03), 855 So.2d 968, 975,
 
 writ denied,
 
 2003-3161 (La.2/6/04), 865 So.2d 724,
 
 writ denied,
 
 2003-3200 (La.2/6/04), 865 So.2d 727.
 

 Looking first at Brewer’s claim for residential treatment at a brain injury facility, we note that there was some testimony to contradict Mr. Gisclair’s 127recommendation of permanent treatment. Licensed rehabilitation counselor Michael Frenzel testified that although inpatient residential treatment is the best option for Brewer, such treatment is needed on a short-term, rather than permanent, basis.
 
 [21]
 
 Further, none of Mr. Brewer’s treating physicians gave estimation as to how long residential treatment is necessary or opined that permanent treatment is needed. Thus, although it is clear that some residential treatment will be beneficial, the record does not reflect that treatment for 47.1 years will be necessary and inevitable. Accordingly, we award Brewer the full and true sum of $4,332,550.00, which amount reflects the median rate of $593.50 for treatment at the Neurological Rehabilitation Living Centers for a period of twenty years.
 
 [22]
 

 With respect to the remaining claims, we note that Brewer’s current treating physicians anticipate that their continued services and the use of prescription medications will be necessary over the course of his lifetime, even during any prospective treatment at a residential brain injury facility. J.B. Hunt and Robert Jackson have not presented any evidence or testimony to contradict those recommendations or to show that the outside estimated healthcare costs are unwarranted. Thus, based on the evidence presented at trial, we award Brewer the full sum of $179,555.00 for doctor visits and onetime healthcare costs. We further award Brewer the sum of $3,904,020.00 for future prescription drugs.
 

 Past and Future Earnings
 

 Next, Brewer asserts a claim for past and future earnings. Brewer avers that in 1999, prior to his accident, he earned an annual income of $22,136.00. Applying his pre-accident income to the 5.25 year period from the date of the | ¡^accident through April 13, 2005, minus two years for the completion of his college education, Brewer submits that he is entitled to the sum of $71,942.00 for past earnings.
 
 [23]
 

 Additionally, Brewer seeks an award based on his future earning potential. In support of that claim, Brewer relied on the deposition testimony of defense economist Dan Cliffe. Mr. Cliffe testified that Brewer’s pre-accident income of $22,136.00 per year was considerably lower than the median annual income for college graduates
 
 *953
 
 in the United States of $51,206.00 per year. Mr. Cliffe stated that the income of college graduates generally increases with age until such individuals reach their mid to late fifties, at which time income tends to level off. Also, Mr. Cliffe testified that the average value of fringe benefits for workers in the United States is between 12% and 25% of annual wages.
 

 Based on Mr. Cliffe’s testimony, Brewer seeks $1,625,820.00 for future earnings. Brewer’s calculation of future earnings is based on an estimated annual income of $51,206.00 for a period of 37 years, or until the age of 65. The calculation also takes into account a present value discount rate of 1.8% and fringe benefits at the midpoint rate of 18.5% of annual income.
 

 In considering the claim for past wages, we point out that the defendants have not disputed the stated amount of Brewer’s pre-accident income. We further note that although plaintiff seeks recovery based on earnings of only $11.07 per hour, there is some evidence that Brewer earned wages at a higher rate of $16.00 per hour before the accident. Thus, under these facts and circumstances, we believe that Brewer’s calculation of past earnings is more than substantiated. Accordingly, we award Bi’ewer the full sum of $71,942.00 for past earnings.
 

 12;iTurning then to the claim for future wages, we point out that while the plaintiffs earning capacity at the time of injury is relevant, it is not necessarily determinative of his future ability to earn.
 
 Hobgood v. Aucoin,
 
 574 So.2d 344, 346 (La.1990). Loss of earning capacity, not just pecuniary loss, is the basis for assessing loss of wages.
 
 Folse v. Fakouri,
 
 371 So.2d 1120, 1123 (La.1979). Earning capacity refers to a person’s potential and is not determined by actual loss.
 
 Finnie v. Vallee,
 
 620 So.2d 897, 900 (La.App. 4 Cir.),
 
 writ denied,
 
 625 So.2d 1040 (La.1993). While the plaintiffs earnings at the time of the accident may be relevant, such figures are not necessarily indicative of his past or future lost earning capacity.
 
 Id.
 
 Thus, the courts have often considered the plaintiffs potential for future educational advancement in the calculation of future wages.
 
 See Engles v. City of New Orleans,
 
 2003-0692 (La.App. 4 Cir. 2/25/04), 872 So.2d 1166,
 
 writ denied,
 
 2004-1432 (La.9/24/04), 882 So.2d 1141,
 
 writ denied,
 
 2004-2654 (La.1/7/05), 891 So.2d 697;
 
 see also Lee v. USAA Cas. Ins. Co.,
 
 540 So.2d 1083 (La.App. 1 Cir.),
 
 writ denied,
 
 542 So.2d 515 (La.1989).
 

 Herein, although Brewer had not completed college at the time of the accident, the uncontradicted evidence and testimony shows that he had successfully completed 61.0 credit hours and was in route to reen-roll at Southeastern Louisiana University at the time of the accident. Moreover, defense expert and licensed rehabilitation counselor Michael Frenzel admitted that, prior to the accident, Brewer would have finished college with proper effort. Mr. Frenzel testified that Brewer’s earning capacity would have either been as an industrial worker, such as an electrician, or that of a college graduate. Mr. Frenzel also opined that Brewer would have had a normal career growth.
 

 Curiously, only the plaintiffs figures on lost earning capacity were offered into evidence. J.B. Hunt and Robert Jackson chose not to call their economist, Dan Cliffe, or their rehabilitation counsel, Michael Frenzel, although portions ofJjjthe depositions of both of those individuals were offered into evidence by Brewer. Since the estimation of future lost earnings presented by Brewer are the only figures offered into evidence and all of the discounts used in the calculations were rates utilized by the defendants’ own economist, and given Brewer’s pre-accident potential
 
 *954
 
 to complete his college education, we find that the full sum of $1,625,820.00 is an appropriate award for future earnings herein.
 

 General Damages
 

 Lastly, Brewer asserts a claim for general damages. General damages involve mental pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle that cannot be measured definitively in terms of money.
 
 Boswell v. Roy O. Martin Lumber Co., Inc.,
 
 363 So.2d 506, 507 (La.1978). There is no mechanical rule for determining general damages, and the facts and circumstances of each case must control.
 
 Day v. South Line Equip. Co.,
 
 551 So.2d 774, 784 (La.App. 1 Cir.),
 
 writ denied,
 
 553 So.2d 474 (La.1989).
 

 The facts of this case are that Brewer sustained permanent and debilitating injuries. On the surface, Brewer has apparent scarring on his face, neck, right hip, left shoulder, and left elbow. He also experiences uncontrolled facial twitching. Brewer’s plastic surgeon, Dr. Gary Cox, testified that Brewer has a “reconstructed” face that does not look the same as it did before the accident and that he now has a deviated nasal septum. Despite having already undergone several facial reconstructive surgeries, Dr. Cox opined that Brewer could benefit from some additional minor scar revision procedures.
 

 Also, Brewer’s orthopedic injuries have resulted in pain and disfigurement. Dr. Joe Allen Morgan, an orthopedic surgeon retained by J.B. Hunt and Robert Jackson to conduct an independent medical examination of Brewer, testified that some het-erotopic ossification, which is typical to brain injury patients, has recurred |31in Brewer’s left elbow following his surgery at the Mayo Clinic. As a result, Dr. Morgan noted that Brewer has limited range of motion in his left elbow and cannot straighten his arm, which condition is not likely to improve. Dr. Morgan further testified that what limited motion Brewer does possess in his left elbow is painful, because he has developed arthritis as a result of his injuries. Dr. Morgan reported atrophy of Brewer’s left bicep and forearm and residual arthritis from the fracture of the joints in his right thumb and left little finger, and he noted that Brewer complained of constant pain in his left elbow and right hip. Overall, based on his examination, Dr. Morgan opined that Brewer sustained an anatomic impairment of 28% of his whole person.
 

 Moreover, Brewer has suffered traumatic injury to the right anterior temporal lobe of his brain. Dr. John Robert Clifford, Brewer’s treating neurological surgeon, testified that the plaintiffs magnetic resonance imaging (MRI) reports show atrophy and brain cell death. Dr. Clifford also noted that Brewer has suffered seizures following the accident and that his initial electroencephalogram (EEG) report, prior to the use of anticonvulsant medications, was markedly abnormal. Dr. Clifford opined that Brewer’s various items of brain damage and epilepsy could be attributable to the accident.
 

 Dr. Steven Zuckerman, a neurologist retained by J.B. Hunt and Robert Jackson, also confirmed that Brewer has sustained post-traumatic brain changes, including encephalomalacia, atrophy, axonal injury, and old punctuate hemorrhages. Dr. Zuckerman further admitted that Brewer suffers from bedwetting, changed personality, and disinhibition, which are consistent with his brain injury.
 

 Dr. William Drew Gouvier, an independent licensed psychologist retained by the Louisiana Department of Vocational Rehabilitation to evaluate Brewer, testified that the area of Brewer’s brain that was injured controls executive |32functions and the ability to get organized, make good decisions, and make and follow through
 
 *955
 
 with a plan. Dr. Gouvier stated that loss of personality, as exhibited by Brewer, can also result if fíne points of the brain function are damaged. Upon evaluation in January 2002, Dr. Gouvier diagnosed Brewer with cognitive disorder, together with depressive and anxiety disorders not otherwise specified. Additionally, Dr. Gouvier stated that Brewer has a diminished verbal IQ, which he attributed to his closed head injury.
 

 Dr. John Olson, Brewer’s neurologist, testified that Brewer’s personality change and behavioral problems, including aggression, violence, inappropriate behavior, and impulsiveness, were caused in large part by his brain injury. Dr. Olson stated that Brewer’s behavioral problems worsened in the six years between the accident and trial and that Brewer himself admitted to increasingly aggressive behavior, both verbally and physically.
 

 Dr. Ashwin Sura, Brewer’s psychiatrist, testified that he has both a physical and psychiatric disability. Dr. Sura began treating Brewer in March 2003, at which time he diagnosed him with Attention Deficit Hyperactivity Disorder (ADHD) and major depression and anxiety disorders, all of which he attributed to the injuries sustained in the automobile accident.
 

 The body of medical testimony shows that Brewer’s brain injury is permanent. Dr. Clifford testified, based on his review of two separate neuropsychologists’ reports, that Brewer has residual brain impairments and that there will be future worsening of his cognitive functioning. Similarly, Dr. Zuckerman opined that Brewer is permanently brain damaged and that he does not ■ expect any future improvements in brain function.
 

 As a result of his persistent injuries, Brewer has not been able to successfully reenroll in school or find sustainable employment. Although Brewer attempted to attend Baton Rouge Community College in January 2004, through the Isahelp of state vocational rehabilitation services, he could not keep up with the course work and eventually quit. In November of that same year, Baton Rouge Vocational Services (BRVS) issued a report, concluding that it would be unable to find suitable employment for Brewer in light of his “recent outbursts of anger and aggressive behavior, medical/physical limitations, and transportation issues.”
 
 [24]
 

 Dr. Gregory Ward, a specialist in rehabilitation medicine who treated Brewer at HealthSouth Rehabilitation Hospital, agreed that Brewer is not employable until the issues cited in the BRVS report are addressed. Similarly, defense expert Michael Frenzel agreed that Brewer is disabled and unable to work without rehabilitation at a residential brain injury facility. Dr. Olson was even less optimistic and opined that Brewer is completely disabled and is not going to ever be employable in any capacity.
 

 Likewise, it is doubtful that Brewer will ever be able to live on his own without outside assistance. Dr. Kevin Bianchini, a neuropsychologist retained by J.B. Hunt and Robert Jackson, opined that without additional rehabilitation, Brewer will not be able to live independently. Dr. Olson testified that he was fearful that Brewer would experience future medical and legal troubles if he did not receive the assistance and support of a residential brain injury facility. Moreover, Brewer’s own mother, Mrs. Porche, testified that she does not
 
 *956
 
 believe that her son will ever be able to get married and have children.
 

 Given the nature and extent of Brewer’s injuries, an award of general damages is clearly warranted. A review of the cases with similar multiple injuries and surgeries with permanent brain damage reveal general damage awards ranging from $900,000.00 to $8,000,000.00.
 
 See Aucoin v. State Through Dept, of Transp. and, Dev.,
 
 97-1938 and 97-1967 (La.4/24/98), 712 So.2d 62;
 
 Duzon,
 
 866 So.2d 837;
 
 Wingfield v. State ex rel. Dept. of Transp. and Dev.,
 
 2001-2668 (La.App. 1 Cir. 11/8/02), 835 So.2d 785,
 
 writ denied,
 
 2003-0313 (La.5/30/03), 845 So.2d 1059,
 
 writ denied,
 
 2003-0339 (La.5/30/03), 845 So.2d 1060,
 
 writ denied,
 
 2003-0349 (La.5/30/03), 845 So.2d 1060,
 
 certiorari denied,
 
 540 U.S. 950, 124 S.Ct. 419, 157 L.Ed.2d 282 (2003);
 
 Dennis v. The Finish Line, Inc.,
 
 99-1413 (La.App. 1 Cir. 12/22/00), 781 So.2d 12,
 
 writ denied,
 
 2001-0214 (La.3/16/01), 787 So.2d 319;
 
 Moore v. Safeway, Inc.,
 
 95-1552 (La.App. 1 Cir. 11/22/96), 700 So.2d 831,
 
 writ denied,
 
 97-2921 (La.2/6/98), 709 So.2d 735,
 
 writ denied,
 
 97-3000 (La.2/6/98), 709 So.2d 744;
 
 Pino v. Gauthier,
 
 633 So.2d 638 (La.App. 1 Cir.1993),
 
 writ denied,
 
 94-0243 (La.3/18/94), 634 So.2d 858,
 
 writ denied,
 
 94-0260 (La.3/18/94), 634 So.2d 859. Based on the unique facts and circumstances of this case, we conclude that a general damage award in the amount of $2,500,000.00 is appropriate.
 
 See Jenkins v. State ex rel. Dept. of Transp. and Dev.,
 
 2006-1804 (La.App. 1 Cir. 8/19/08), 993 So.2d 749,
 
 unit denied,
 
 2008-2471 (La.12/19/08), 996 So.2d 1133.
 

 CONCLUSION
 

 For the foregoing reasons, we reverse the trial court’s judgment on the jury verdict and render judgment finding defendants J.B. Hunt Transport, Inc. and Robert Jackson 60% at fault and plaintiff Brian Shane Brewer 40% at fault for the accident at issue. We further award damages as follows: (1) Past Medical Expenses and Attendant Care: $563,747.93; (2) Future Medical Care (Inclusive of Costs of Residential Brain Injury Facility, Prescription Medications, Outside Medical Care, and One Time Healthcare Needs): $8,416,125.00; (3) Past Earnings: $71,942.00; (4) Future Earnings: $1,625,820.00; and (5) General Damages: $2,500,000.00. The entire damage award is to be reduced in proportion to Brewer’s percentage of fault. Costs of this appeal are to be shared by the 13r,plaintiff/appellant and defendants/appel-lees J.B. Hunt and Robert Jackson in accordance with their respective percentages of fault.
 

 REVERSED AND RENDERED.
 

 DECISION ON REHEARING
 
 ON MAY 13, 2009, APPLICATION FOR REHEARING BY BRIAN SHANE BREWER WAS GRANTED ON THE LIMITED ISSUE OF INTEREST ONLY
 

 An award of legal interest in tort cases is not discretionary with the court, as the interest attaches automatically until the judgment is paid, whether prayed for in the petition or mentioned in the judgment.
 
 Dufrene v. Duncan,
 
 93-0403, p. 5 (LaApp. 1 Cir. 3/11/94), 634 So.2d 19, 22. Accordingly, we hereby amend the judgment of this court dated March 18, 2009, so as to award legal interest from the date of judicial demand.
 

 /s/ James E. Kuhn
 

 Judge
 

 /s/ John M. Guidry Judge
 

 /s/ Edward J. Gaidry
 

 Judge
 

 [1]
 

 . As a result of his injuries, Brewer has no independent recollection of the accident and the immediately preceding events. Thus, his statement of the facts is based on the testimony of eyewitnesses and an accident reconstruction expert.
 

 [2]
 

 . Following the initiation of this litigation, interdiction proceedings were initiated in the 18th Judicial District Court for the Parish of Pointe Coupee, and Louisiana attorney James C. Dewey was appointed and confirmed as curator of Brewer's financial and legal affairs. Subsequently, pursuant to an order dated January 9, 2006, Mr. Dewey was substituted in this proceeding for Brewer. For practical purposes, however, we will continue to refer to the plaintiff herein as "Brewer.”
 

 [3]
 

 . Also, on December 20, 2000, Brewer filed a supplemental and amended petition for damages, adding the State of Louisiana, through the Department of Transportation and Development (DOTD), as a party defendant. Therein, Brewer alleged that DOTD contributed to the accident at issue through its lack of reasonable care or negligence by: (1) failing to respond after a prior similar accident that resulted in a fatality at almost the same location on Interstate 1-12 on January 11, 2000; (2) by failing to post signs in the construction zone that were adequate in number, placement, and specificity so as to put motorists on notice that rapid slowdowns could occur; and (3) by failing to post any signs for a span of several miles before the accident location to several miles beyond that site. Following trial, however, the jury found that DOTD was free from fault, and Brewer's protective appeal has reserved the issue of DOTD's liability for consideration only in the event that issue is raised by the other defendants. Accordingly, since J.B. Hunt and Jackson have not answered the appeal and asserted the liability of DOTD, the claims against DOTD are abandoned for purposes of this appeal.
 

 [4]
 

 . In finding no error on the face of the jury instructions, we do not address the propriety of the jury's application of the law set forth by the trial court to the facts herein. Rather, that is a separate issue that will be addressed in our discussion of Assignment of Error Three.
 

 [5]
 

 . Initially, DOTD and J.B. Hunt and Robert Jackson separately applied for writs, seeking review of the lower court’s pre-trial ruling granting the motion in
 
 limine
 
 insofar as it related to Brewer’s alleged substance abuse and criminal history. Both this court and the Louisiana Supreme Court denied writs and declined to exercise supervisory jurisdiction.
 
 See Brewer v. J.B. Hunt Transport, Inc.,
 
 2005-2371 and 2005-2643 (La.App. 1 Cir. 12/29/05)(unpublished writ actions),
 
 writ denied,
 
 2006-0018 (La.1/5/06), 918 So.2d 1018.
 

 [6]
 

 .Due to continued physical and emotional impairments, Brewer's neurologist recommended that he not testify at trial. Thus, in the absence of Brewer himself, Mrs. Porche was one of the plaintiff’s key witnesses.
 

 [7]
 

 . We are presented with the unusual scenario where the character under attack belongs to the plaintiff Brewer, who did not testify at trial. To the extent that the "truthfulness” of Brewer was not at issue, he has raised the question of whether character evidence is even admissible under La.Code Evid. art. 608. Nonetheless, we do not have to resolve that issue, because the evidence is otherwise inadmissible under La.Code Evid. arts. 402 and 403.
 

 [8]
 

 . The author of this opinion recognizes that he previously dissented from the denial of writs following the grant of Brewer's motion in
 
 limine,
 
 noting that the evidence related to witness credibility.
 
 See Brewer,
 
 2005-2371 and 2005-2643 (Kuhn, J., dissenting). However, it was not clear on writs that Brewer himself would not testify at trial and that the evidence of alleged substance abuse and criminal history would not be used to impeach Brewer's own personal testimony. Furthermore, the dissent neither contemplated nor sanctioned the alteration of the evidentiary rules mid-trial. For those reasons, the basis of that dissent has been negated.
 

 [9]
 

 . In making this finding, we note that the Louisiana Driver’s Guide provides, in pertinent part, as follows with respect to lane markings:
 

 Single Solid White Lines indicate that movement from lane to lane is hazardous. The wider the line, the greater the hazard. You may cross a solid white line only with great care.
 

 Louisiana Department of Public Safety and Corrections, Louisiana Driver's Guide Classes “D” and "E" 31 (1/09).
 

 [10]
 

 . Notwithstanding Robert Jackson’s testimony, Michael Anthony Ricca, a civil engineer for the Louisiana Department of Transportation and Development, testified that the accident occurred nearly two and a half miles before the right lane began to phase out for construction.
 

 [11]
 

 . It is also alleged that Brewer, who was estimated to have been traveling between 62.4 and 69.2 miles per hour, was speeding. However, we decline to make any such finding, because the record shows that there is some discrepancy as to whether the reduced speed limit was properly posted in the construction zone.
 

 [12]
 

 .We are cognizant that the Louisiana Supreme Court has analogized the allocation of fault after an appellate court "clearly wrong”
 
 *948
 
 determination to the quantum area requiring that an appellate court give deference to the trial court and limit its reallocation of fault to lowering or raising the percentage to the highest or lowest point respectively, which is reasonably within the trial court’s discretion.
 
 See Clement v. Frey,
 
 95-1119, 95-1163 (La.1/16/96), 666 So.2d 607. However, this requirement has an important limitation and does not apply when a
 
 de novo
 
 review is warranted by a legal error implicit in the fact finding process or when a mistake of law forecloses the fact finding process.
 
 Clement,
 
 666 So.2d at 612 (Lemmon, L, concurring);
 
 Robinson v. Flowers,
 
 41, 798, 41, 799, 41, 800, p. 8-9 (La.App. 2 Civ. 1/24/07), 949 So.2d 549, 555;
 
 LeBlanc v. Stevenson,
 
 2000-157, p. 6 (La. 10/17/00), 770 So.2d 766, 771-772. Thus, in this case where a legal error undermined the jury’s allocation process, we are free to reallocate fault
 
 de novo
 
 and without the limitation imposed by
 
 Clement.
 

 [13]
 

 . As with the allocation of fault, the legal error committed by the trial court requires us to determine quantum
 
 de novo. Sevario,
 
 752 So.2d at 231;
 
 Boudreaux v. Farmer,
 
 604 So.2d 641, 653 (La.App. 1 Cir.1992),
 
 writ denied,
 
 605 So.2d 1373 (La.1992),
 
 writ denied,
 
 605 So.2d 1374 (La.1992). Since the trial court has made no award for damages, we are required to make an award that is just and fair for each item of damages revealed by the record.
 
 LeBlanc,
 
 770 So.2d at 771-772.
 

 [14]
 

 .Additionally, Dr. John Clark, Brewer's pain management specialist, requested that Mr. Gisclair "price out” a residential program and compare it to the cost of attendant care. Upon comparison, Mr. Gisclair advised against attendant care, because attendant care providers are not vested with the same legal authority to restrain a patient or control his comings and goings as are inpatient care providers.
 

 [15]
 

 . Brewer’s choice of facilities is presumably based in part on the fact that the Neurological Rehabilitation Living Centers is located in Louisiana and is close to family and friends.
 

 [16]
 

 . The 47.1 years life expectancy was based on the testimony of the defendants’ economics expert, Dan Cliffe.
 

 [17]
 

 . Brewer's prescription drug needs, as outlined in the life care plan prepared by Mr. Gisclair, include the following medications: (1) Alprazolam for anxiety and panic disorder; (2) Desmopressin for urinary incontinence; (3) Lamactil for seizures and mood instability; (4) Methylphenid for ADHD; (5) Oxycontin for pain management; (6) Percocet for pain management; (7) Trileptal for seizures and mood stability; and (8) Zoloft for depression. The listed medications include generic drug options, whenever available.
 

 [18]
 

 . Brewer admits that, prior to trial, defense economist Dan Cliffe previously calculated lifetime prescription costs in the amount of $1,587,000.00. However, Brewer submits that the yearly cost of $16,850.00 used by Mr. Cliffe was much lower than the $41,432.00 yearly cost as of the time of trial and as reflected in Mr. Gisclair’s revised life care plan. Thus, multiplying Mr. Cliffe’s total by the ratio between the former and revised costs, Brewer submits that the updated prescription costs are $3,904,020.00.
 

 [19]
 

 . The initial evaluation is a mandatory cost at the Neurological Rehabilitation Living Centers.
 

 [20]
 

 . The life care plan does not make any allowance for future hospitalizations or other treatment that might be necessitated by Brewer's condition.
 

 [21]
 

 . Following any inpatient residential treatment, Mr. Frenzel testified that Brewer will always need ongoing services on a daily basis but to what degree and at what cost remains uncertain.
 

 [22]
 

 . Rather than attempt to apply a discount factor and to consider inflation, we will utilize the total offset method herein in our award of damages for future treatment at a residential brain injury facility.
 
 See Schwamb v. Delta Air Lines, Inc.,
 
 516 So.2d 452, 465 (La.App. 1 Cir. 1987),
 
 writs denied,
 
 520 So.2d 750 (La.1988).
 

 [23]
 

 .At trial, Brewer’s mother, Mrs. Porche, testified that her son was on his way to reen-roll in Southeastern Louisiana University at the time of the accident. Consistent with Mrs. Porche's testimony, the university course catalogue was found on the front seat of Brewer’s pickup truck at the accident scene. Insofar as Brewer needed another two years of college credit in order to earn his degree and he likely would not have worked during that time period, Brewer’s claim for past earnings is based on 3.25 years, rather than 5.25 years, of lost income.
 

 [24]
 

 . Following the accident, Brewer was cleared by Dr. Olson and the Touro Rehabilitation Center to operate a motor vehicle with a number of restrictions. Notwithstanding that clearance, Brewer's mother testified that she has been unable to enforce the driving restrictions due to Brewer’s unpredictable behavior and anger issues. Brewer, therefore, has not been allowed to drive.