35 So.3d 230 (2010)
Brian Shane BREWER
v.
J.B. HUNT TRANSPORT, INC. and Robert E. Jackson.
Nos. 2009-C-1408, 2009-C-1428.
Supreme Court of Louisiana.
March 16, 2010.
Rehearing Denied May 7, 2010.
*232 Adams & Reese, LLP, Louis Charles LaCour, Jr., Christine Simons Fortunato, New Orleans, Casteel & Associates, LLC, Durward D. Casteel, Baton Rouge, and Vasser & Vasser, Claude David Vasser, Jr., Baton Rouge, for Applicant in 2009-C-1408.
G. Stephen Covert, Walter Landry Smith, Baton Rouge, Christopher M. Moody, Hammond, Perry, Atkinson, Balhoff, Mengis & Burns, LLC, John W. Perry, Jr., Baton Rouge, for Respondent in No. 2009-C-1408.
G. Stephen Covert, Walter Landry Smith, Baton Rouge, Perry, Atkinson, Balhoff, Mengis & Burns, LLC, John W. Perry, Jr., Baton Rouge, for Applicant in No. 2009-C-1428.
Adams & Reese, LLP, Louis Charles Lacour, Jr, Christine Simons Fortunato, New Orleans, Christopher M. Moody, Casteel & Associates, LLC, Durward D. Casteel, Vasser & Vasser, Claude David Vasser, *233 Jr., Baton Rouge, for Respondent in No. 2009-C-1428.
WEIMER, Justice.[1]
This case arises out of a suit for personal injuries sustained when twenty-three-year old Brian Shane Brewer (Brewer), driving a 1994 Chevrolet pickup truck on Interstate I-12 in Livingston Parish, rear-ended an 18-wheel tractor-trailer owned by J.B. Hunt Transport, Inc. (Hunt) and being operated by its employee, Robert E. Jackson (Jackson). The entire front cab of Brewer's truck was crushed beneath the 18-wheeler, resulting in permanent, life-altering injuries to Brewer.
Following a two-week trial, the jury returned a verdict in favor of the defendants, finding Brewer 100 percent at fault for the collision. On appeal, the court of appeal reversed the jury's allocation of 100 percent fault to Brewer, concluding that the jury's fact-finding process was interdicted by a legal error on the part of the district court in allowing the jury to hear references of Brewer's prior bad acts, which were irrelevant to the accident. Conducting a de novo review of the record, the court of appeal found Hunt and Jackson to be 60 percent at fault for the accident. Brewer was assessed with 40 percent of the fault. Special damages in the amount of $10,677,634.93 and general damages in the amount of $2,500,000.00, to be reduced in proportion to Brewer's degree of fault, were awarded.
We granted certiorari primarily to review the appellate court's decision to conduct a de novo review of the record. After reviewing the record and the arguments of the parties, we find the court of appeal erred in conducting a de novo review. Reviewing the judgment under the appropriate manifest error standard, we nevertheless find the jury was manifestly erroneous in determining Hunt and Jackson were free from fault in the accident. Cognizant of the rule under which a reviewing court, in disturbing a clearly wrong allocation of fault, is limited to lowering or raising the fault allocation to the highest or lowest point respectively, which is reasonably within the trier of fact's discretion,[2] we find Hunt and Jackson to be 30 percent at fault and Brewer 70 percent at fault for the accident. In all other respects, the judgment of the court of appeal is affirmed.

FACTS AND PROCEDURAL HISTORY
The accident that gives rise to this litigation occurred at approximately 12:51 p.m. on January 13, 2000, on Interstate I-12 near milepost 11.1 in Livingston Parish. At that time, Jackson and Brewer were traveling in an easterly direction on the interstateJackson driving an 18-wheel tractor-trailer owned by his employer, Hunt, and carrying a load of bulk paper; Brewer driving his 1994 Chevrolet pickup truck en route to Southeastern Louisiana University to register for the upcoming semester. Jackson was traveling in the right lane of traffic; Brewer was to his rear in the left lane. This particular section of the interstate was part of ongoing construction work, and, as a result, the posted speed limit had been reduced to 60 miles per hour. In anticipation of the closure of the right lane to accommodate the construction work, Jackson slowed the 18-wheeler from approximately 40-45 miles per hour to approximately 5-10 miles per hour; he proceeded to move the tractor-trailer *234 into the left lane of traffic across the solid white line that divided the two lanes. Brewer, proceeding in the left lane at or near the posted speed limit, reacted to the 18-wheeler's movement first by steering toward the right, then by straightening the truck's wheels and braking hard. Despite skidding for approximately 102 feet, Brewer was unable to stop his vehicle in time to avoid colliding with the rear end of the tractor-trailer. The pickup truck came to rest against the rear tires of the 18-wheeler, the front cab completely crushed beneath the trailer.
Brewer sustained permanent, debilitating injuries in the accident, including a traumatic injury to the right anterior temporal lobe of his brain which has resulted in bed-wetting, seizures, short-term memory deficits, a lowered I.Q., changed personality and disinhibitionproblems for which Brewer will require long-term treatment at a residential brain-injury facility.[3]
Brewer filed suit against Hunt and Jackson, seeking damages for the injuries he sustained in the January 2000 rear-end collision.[4] By supplemental and amending petition, the State of Louisiana through the Department of Transportation and Development (State) was added as a defendant. Each of the defendants denied liability for the accident and asserted the affirmative defense of comparative fault on the part of Brewer.
The case was tried before a jury from January 9-26, 2006. Following the presentation of evidence and arguments of counsel, the jury returned a verdict in favor of the defendants. Specifically, the jury found Jackson and the State to be free from any negligence, effectively casting Brewer with 100 percent of the responsibility for the accident. The district court rendered judgment in accordance with the jury's findings and dismissed with prejudice all claims filed against the defendants.
Following the district court's denial of Brewer's motion for judgment notwithstanding the verdict or, alternatively, for new trial, Brewer appealed. The Court of Appeal, First Circuit, reversed the district court's judgment on the jury verdict. Brewer v. J.B. Hunt Transport, Inc., 08-1666 (La.App. 1 Cir. 3/18/09), 9 So.3d 932. Finding the district court erred in allowing the jury to hear references to certain prior "bad acts" of Brewer which were irrelevant to the accident, the court of appeal determined the evidentiary error interdicted the fact-finding process, "making it difficult, if not impossible, for the jury to make a fair and impartial determination of liability." Brewer, 08-1666 at 12; 9 So.3d at 943. Accordingly, the court of appeal accorded no deference to the fact findings and credibility determinations made by the jury and undertook a de novo review of the record. Based on that review, the court of appeal determined Jackson acted negligently in attempting to make a lane change across a solid white lane line, and, by failing to complete his lane change prior to impact, created a hazardous situation for approaching motorists by blocking both *235 lanes of traffic. Notwithstanding Jackson's negligence, the appellate court determined Brewer also acted negligently in failing to keep a proper lookout and to react timely by applying his brakes.
Drawing upon the factors set forth by this court in Watson v. State Farm Fire & Casualty Insurance Co., 469 So.2d 967 (La.1985), the court of appeal concluded that while both Jackson and Brewer were negligent, Jackson and his employer, Hunt, bear the greater degree of responsibility for the accident. The court reasoned that while Brewer's inattention was a contributing cause of the accident, it was not the primary cause. Because of: (1) the magnitude of the risk created by the 18-wheeler; (2) the careless manner in which Jackson attempted to merge into Brewer's lane; (3) Jackson's knowledge as a professional truck driver of the danger involved in lane changes, especially across solid white lane lines; (4) his greater experience and training; and (5) the magnitude of the harm created by Jackson's conduct, the court of appeal determined 60 percent of the fault for the accident should be allocated to Jackson and his employer, Hunt. Brewer was assessed with 40 percent of the fault.[5]
Because the jury did not reach the issue of damages, the court of appeal conducted a de novo assessment, awarding $563,747.93 for past medical expenses, $8,416,125.00 for future medical care, $71,942.00 for past earnings, $1,625,820.00 for future earnings, and $2,500,000.00 for general damages. The court directed the entire award be reduced in proportion to Brewer's percentage of fault, and rendered judgment accordingly.[6]
We granted certiorari primarily to address Hunt's and Jackson's contention the court of appeal erred in concluding the district court improperly admitted the evidence of Brewer's pre-accident "bad acts," and even if the prior "bad acts" evidence was improperly admitted, the court of appeal erred in determining the improperly admitted evidence interdicted the jury's factual findings with respect to the issue of Brewer's liability, such that a de novo review of the record was warranted. Brewer v. J.B. Hunt Transport, Inc., 09-1408, 09-1428 (La.10/16/09), 19 So.3d 465.

LAW AND DISCUSSION

Evidence of Prior Bad Acts
Brewer's conduct both prior to and after the accident became the focus of substantial pre-trial controversy as defendants delved into Brewer's background, insisting that his history of substance abuse was relevant to his credibility, his failure to mitigate damages, his loss of enjoyment of life, and his medical expenses. Because there was no contention by any party that drugs or alcohol were involved in the accident or that pre-accident drug use caused Brewer's brain injury, Brewer's counsel filed several motions in limine, seeking to exclude all evidence of Brewer's substance abuse both prior to and after the accident, as well as all evidence of his criminal record. Following a hearing conducted over several days and the receipt of extensive evidence, the district court granted the motions in limine, prohibiting all parties, including the plaintiff, from offering evidence of drug use by Brewer before or *236 after the accident and from referencing any arrests, crimes, or wrongs not shown by certified court records to have resulted in felony convictions within the last ten years after Brewer ceased to be a juvenile.[7] In oral reasons, the district court explained the probative value of such evidence was outweighed by its prejudicial effect, that the attention of the jury should be focused on the central issue in the case, i.e., the accident, causation, liability and damages, and that evidence of drug use or criminal arrests would "only do harm to the plaintiffs character in the eyes of the jury."
This evidentiary ruling was altered mid-trial after Brewer's mother and primary caregiver, Kimberly Porche, was called to testify.[8] During her direct examination, Porche testified as to the changes the accident had wrought on her son's life, noting before the accident, Brewer had been a happy, normal, affectionate child with an active social life and a good work history, but after the accident he has experienced behavioral changes that make him prone to fits of rage, violence and inappropriate behavior, leaving him socially isolated and an easy target for unsavory individuals who prey on him for his pocket money and medications.
Toward the close of Porche's direct examination, defense counsel moved the district court to re-visit its ruling on the motions in limine, arguing that by testifying about Brewer's lifestyle and behavior before the accident, Porche had opened the door to evidence outlining the less exemplary aspects of his past; specifically his drug use and arrests. The district court granted the defense motion, ruling that in light of Porche's "glowing" depiction of Brewer before the accident, the door had been opened for limited testimony regarding Brewer's pre-accident crimes, wrongs or bad acts, and the probative value of such evidence was not outweighed by any potential prejudice.
Accordingly, on cross-examination, Porche was asked about certain employment and legal problems encountered by her son prior to his accident. Over objections by Brewer's counsel, Porche acknowledged her son had been fired from a job in 1998 after being accused of stealing copper wire from the jobsite, and criminally charged, although the charge was later dismissed.[9] In addition, Porche admitted Brewer, along with a friend, had been arrested for possession of "GHB."[10] While that charge was also dismissed, Porche acknowledged her son served approximately two to three months in East Baton Rouge Parish Prison for contempt of court upon failing a court ordered drug test administered in connection with the possession charge.
On appeal, Brewer argued the "bad acts" evidence was improperly admitted. The court of appeal agreed, concluding the *237 evidence of Brewer's pre-accident drug use and arrests was irrelevant and therefore inadmissible, and even if relevant any potential probative value of such evidence was outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Brewer, 08-1666 at 11; 9 So.3d at 943. The court then went on to conclude the erroneous admission of the "bad acts" evidence interdicted the fact-finding process to such an extent the jury was prevented from making a fair and impartial determination of liability. Brewer, 08-1666 at 12; 9 So.3d at 943. Accordingly, the court of appeal concluded a de novo review of the liability determination was warranted. Id., 08-1666 at 14; 9 So.3d at 944.
Before this court, defendants Hunt and Jackson insist the evidence was properly admitted and the district court correctly concluded Porche's "glowing" characterization of her son "opened the door" to questions challenging that characterization. In the alternative, they insist even if erroneously admitted, the "bad acts" evidence did not interdict the jury's factual findings with respect to liability such that de novo review was warranted.
While defendants have launched a two-prong attack on the court of appeal judgmentchallenging both the court of appeal's ruling on the admissibility of the evidence and its decision to conduct a de novo reviewwe do not find it necessary to resolve the first issue raised by defendants, i.e., the admissibility of the "bad acts" evidence. In fact, we expressly decline to do so because we agree with the defendants' alternative argument and find even if the "bad acts" evidence was erroneously admitted, that evidence did not interdict the jury's factual findings with respect to liability such that a de novo review was warranted.

Standard of Review
Although the Louisiana Constitution extends appellate jurisdiction in civil cases to both law and facts, the exercise of this power is limited by the jurisprudential rule that factual determinations of the trier of fact will not be set aside by a reviewing court unless they are manifestly erroneous or clearly wrong. Foley v. Entergy Louisiana, Inc., 06-0983, p. 9 (La.11/29/06), 946 So.2d 144, 153; Ferrell v. Fireman's Fund Insurance Co., 94-1252, pp. 3-4 (La.2/20/95), 650 So.2d 742, 745.
In the instant case, the court of appeal concluded the "bad acts" evidence, once admitted, allowed defendants to confuse the issues of liability and damages and mislead the jury, thereby prejudicing the jury in answering, not a mere collateral question, but the question that was the crux of the case, specifically whether Hunt and Jackson bore any degree of fault for the accident. Brewer, 08-1666 at 14; 9 So.3d at 943, 945. Accordingly, the court of appeal concluded that a de novo review of the liability determination was warranted. Id. We disagree.
Assuming the "bad acts" evidence was erroneously admitted, the central inquiry that must be pursued is which, if any, of the jury findings were tainted by the erroneous admission. In this case, the jury was asked to determine, yes or no, if Jackson was negligent and whether that negligence was a cause or substantial factor in the accident. The jury was then asked to determine, yes or no, if the State was negligent and whether that negligence was a cause or substantial factor in the accident. Because the jury answered the first four interrogatories in the negative, finding Jackson and the State were not negligent and their negligence was not a cause or substantial factor in the accident, it was not required to answer the *238 next two interrogatories: Do you find that plaintiff, Brian Shane Brewer, was negligent with regard to this accident; and was the negligence of plaintiff, Brian Shane Brewer, a cause or substantial factor in the accident.
The central issue in this case was whether Jackson and/or the State were at fault to any degree for the accident. Resolution of this issue turned on a myriad of questions, including signage, where the vehicles were in the moments before impact, what movements they made and when, the distances between them, post-accident forensic data, and the accounts of eyewitnesses and experts on these points. The evidence that, years prior to the accident, Brewer was arrested for possession of GHB and spent time in jail for failing a court-ordered drug test, and that he was fired from a job after being accused of stealing copper wire, is not directly relevant to this central issue. Rather, its relevance is tied to the issue of damages, as defense counsel made clear to the jury in closing argument.[11]
Contrary to the court of appeal's suggestion, there was no attempt by defense counsel to use the "bad acts" evidence to argue Brewer was negligent. The jury was told by the expert in accident reconstruction, Bland Stephen Jackson (Steve Jackson),[12] that there was no evidence to suggest drugs or alcohol played any role in the accident. Brewer, who has no recollection of the accident, did not testify at trial, so his credibility with respect to the events leading up to the accident was not affected by the evidence. He offered no evidence at all on the central issue of liability. Therefore, it is clear evidence of Brewer's pre-accident arrests and brief incarceration does not relate to any essential issue of fact determined by the jury in answering the negligence inquiry. As we noted in Adams v. Rhodia, Inc., 07-2110 (La.5/21/08), 983 So.2d 798:
The rule of law requiring an appellate court to exercise great restraint before upsetting a jury verdict is based, in part, on respect for the jury determination rendered by citizens chosen from the community who serve a valuable role in *239 the judicial system. We assume a jury will not disregard its sworn duty and be improperly motivated.
Adams, 07-2110 at 6, 983 So.2d at 804. Here, the "bad acts" evidence was aimed at challenging Brewer's damages, and did not touch on the negligence of Jackson and the State. Accordingly, because we find the "bad acts" evidence, even if erroneously admitted, would have affected only the jury's finding pertinent to damages and not negligence, we find a manifest error standard of review regarding the jury's finding of negligence is appropriate, and the court of appeal erred in conducting a de novo review of the evidence regarding that finding.[13]

Allocation of Fault
The applicable standard of review is the manifestly erroneous or clearly wrong standard. To reverse a factfinder's determination under this standard of review, an appellate court must undertake a two-part inquiry: (1) the court must find from the record that a reasonable factual basis does not exist for the finding of the trier of fact; and (2) the court must further determine the record establishes the finding is clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). Ultimately, the issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Id. If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Id. at 882-883.
Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous. Id. at 883. However, where documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness's story, a reviewing court may well find manifest error. Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989). Where such factors are not present, however, and a factfinder's determination is *240 based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Id. This is not to say, however, that factual determinations cannot ever, or hardly ever, be upset. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099, p. 8 (La.7/5/94), 639 So.2d 216, 221. Although deference to the factfinder should be accorded, because appellate courts have a constitutional duty to review both law and facts, they have the right and the obligation to determine whether a trial court verdict is clearly wrong based on the evidence, or clearly without evidentiary support. Id.
In the instant case, the jury was presented with two versions of how this accident occurred. Hunt and Jackson maintained the accident was the sole fault of Brewer, who, they alleged, rear-ended Jackson after he had completed his lane change and had come to a stop in the left lane. Brewer, on the other hand, insisted the accident occurred during the course of a precipitous lane change by Jackson, commenced without first signaling or ascertaining whether the movement across a solid white lane line could be completed with safety.[14] Before this court, Hunt and Jackson maintain the jury's decision to credit their version of the accident and conclude Brewer was the sole party at fault for the accident was neither manifestly erroneous nor clearly wrong.
Louisiana courts have adopted a duty-risk analysis in determining whether liability exists under the facts of a particular case. Under this analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care; (2) the defendant failed to conform his or her conduct to the appropriate standard of care; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiffs injuries; and (5) actual damages. Pinsonneault v. Merchants & Farmers Bank & Trust Company, 01-2217, p. 6 (La.4/3/02), 816 So.2d 270, 275-276. Whether a duty is owed is a question of law; whether defendant has breached a duty owed is a question of fact. Mundy v. Department of Health and Human Resources, 620 So.2d 811, 813 (La.1993).
Pertinent to the instant case are the duties of a following driver and the duties of a motorist making a lane change. Under LSA-R.S. 32:81, the driver of a following motor vehicle must maintain a reasonable and prudent distance from the preceding vehicle, having due regard for the speed of such vehicle and the traffic *241 upon and the condition of the roadway. Although a presumption of negligence generally arises when a following motorist is involved in a rear-end collision,[15] the following motorist may escape liability for the collision by establishing the unpredictable driving of the preceding motorist created a sudden emergency that the following motorist could not have reasonably anticipated. Cheairs v. State, Department of Trasportation and Development, 03-0680, p. 15 (La.12/3/03), 861 So.2d 536, 545.
The duties of a motorist making a lane change are also set forth in the law and jurisprudence. Under LSA-R.S. 32:79, the driver on a roadway laned for traffic must drive as nearly as practicable entirely within a single lane and must not move from that lane until he or she has first ascertained such movement can be made with safety. In addition, pursuant to LSA-R.S. 32:104(A), a motorist changing lanes may not turn his or her vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety. Signals must be used to indicate an intention to change lanes. LSA-R.S. 32:104(D). In summary, a motorist who attempts to change lanes on a multiple lane highway must ascertain before attempting the maneuver that it can be made safely without endangering oncoming traffic. Averna v. Industrial Fabrication and Marine Service, Inc., 562 So.2d 1157, 1161 (La.App. 4 Cir.1990). Under the jurisprudence, a greater burden of care is required for the motorist changing lanes than is demanded of a driver proceeding at a lawful rate on a straight line in a marked lane. Id.
At trial, Jackson offered one version of how the accident occurred. He testified he was driving his 18-wheeler in the right lane of traffic at approximately 40-45 mph when he saw orange barrels ahead of him indicating the right lane was closing and traffic should merge. He observed vehicles in the left lane stacking up in line, but traffic was continuing to move. He looked in his left mirror, but did not see Brewer's pickup truck, or any other vehicles close to him. He initiated his left turn signal before he began to move to the left lane, but does not remember whether the signal was on thereafter. He slowed the 18-wheeler to approximately 5-10 mph, crossed the dotted white lane line and moved completely into the left lane. At that point, traffic ahead of him stopped. He came to a stop, and remained stopped, his 18-wheeler fully in the left lane, for "minutes" before he felt a "tremendous jolt" that knocked the vehicle's trailer into the right lane. His head was knocked back by the force of the impact. Although he checked his left mirror before starting the lane change and did not see Brewer, Jackson testified he did not check his mirror in the three seconds before the collision. He did not move the 18-wheeler after impact.
Jackson's version of the accident was corroborated to some extent by the testimony of Amy and Shelton LeBlanc. The LeBlancs were traveling in the left lane, behind Brewer. They first observed the 18-wheeler when they were about half a mile back. They testified the 18-wheeler was in the left lane and was not moving. According to the LeBlancs, when Shelton first noticed the 18-wheeler, he disengaged his cruise control and started coasting. The couple observed Brewer ahead *242 of them in the left lane and noticed he was not slowing down. According to the LeBlancs, Brewer did not apply his brakes until a second or so before he hit the truck.
A different version of the accident was advanced by Mark Moreno. Moreno testified he was driving in the right lane, approximately half a car-length behind Brewer, who was in the left lane. There were two cars in front of him. He realized there was construction ahead as traffic was starting to pile up. Moreno testified the 18-wheeler, also in the right lane, saw an opportunity to move into the left lane. The driver did not activate his left turn signal before initiating the lane change. The brake lights of the 18-wheeler were on, but dim. As the 18-wheeler moved into the left lane, the two cars in front of Moreno moved around the 18-wheeler and passed it on the right. At that point, Moreno was almost parallel to Brewer, in the right lane. The 18-wheeler was still in the process of the lane change and still moving when it was struck by Brewer. The collision occurred in the center of the highway. Moreno stated he had to steer his car onto the right shoulder to avoid striking the 18-wheeler himself. The whole event lasted 10-12 seconds.
Brewer, who has no recollection of the accident, could offer no testimony as to how the accident occurred. However, Captain Joseph Sanchez of the Denham Springs Police Department did testify as to the results of his investigation. Sanchez identified photos taken at the accident scene which clearly indicate the position of the vehicles after the accident. The photographs show the highway divided by a solid white lane line, the trailer of the 18-wheeler straddling the white lane line. The photos also reveal a trail of glass, debris, and gouge marks on the roadway, indicating the impact was actually farther back on the road than the final resting point of the vehicles. Skid marks apparent on the pavement demonstrate Brewer initially steered to the right, possibly to move around the truck, then braked hard.
The sole expert in accident reconstruction to testify had been retained by Hunt. Steve Jackson testified the physical evidence indicates the 18-wheeler was not stopped, but moving at the time of impact and traveled approximately 15-22 feet, dragging Brewer's truck with it, before it came to a final stop. When it did stop, the right rear of the 18-wheeler was still in the right lane, the vehicle angled to the left. Based on the relative weights of the 18-wheeler (70-80,000 lbs.) and Brewer's pickup truck (3,000 lbs.) Steve Jackson testified it was impossible for the pickup truck to have knocked the 18-wheeler forward and into the right lane at impact. In addition, the accident scene photos show pre-impact skid marks for 102 feet, revealing Brewer first steered right, and then straightened his wheels before braking hard. Steve Jackson opined it was reasonable to conclude from the skid marks that Brewer noticed the 18-wheeler making a lane change, but thought it was moving faster than it actually was and that he could get around it by passing on the right, at some point realizing he could not do so and jamming on his brakes. Steve Jackson further testified the accident occurred approximately 2½ miles from the point where the right lane began to taper off and asphalt was being laid, and that the driver of the 18-wheeler would not have been able to see any orange barrels from that distance.[16] He verified both vehicles were still partially in the right lane when the collision occurred and Jackson's testimony that he was stopped when the collision *243 occurred is not consistent with the physical facts.
The jury was presented with two different versions of the accident. However, in this case, the objective physical evidence directly contradicts one of those versions: Jackson's claim that he was fully in the left lane, at a complete stop "for minutes" before being rear-ended by Brewer. Instead, the objective physical evidence establishes the lane change was still in progress at the time of the collision. The accident scene photographs clearly document that the 18-wheeler was angled to the left, with the right rear tire of the tractor on or close to the lane line and the right rear portion of the trailer still in the right lane. The front cab of Brewer's truck was underneath the 18-wheeler with the rear of the truck straddling the lane line, but angled to the left.
Under the jurisprudence, when there is a change of lanes by a motorist immediately preceding an accident, the burden of proof is on the motorist changing lanes to show that it was first ascertained that the movement could be made safely. Barrociere v. Batiste, 99-1800, p. 4 (La.App. 4 Cir. 2/2/2000), 752 So.2d 324, 327; Graham v. Edwards, 614 So.2d 811, 816 (La.App. 2 Cir.1993), writ denied, 619 So.2d 547 (La. 1993); Averna, 562 So.2d at 1160. Given the objective physical evidence indicating that the lane change was still in progress at the time of the collision, the question that presents itself is whether the defendants carried their burden of proof.
After reviewing the testimony and the evidence, we find that the defendants failed in their burden of proving that Jackson's conduct comported with the greater burden of care that is required for the motorist changing lanes, Averna, 562 So.2d at 1161, and that, as a result, the jury was clearly wrong in refusing to assign any fault for the accident to Jackson. Jackson's version of the accident, which hinges on the contention he had completed his lane change and was fully stopped in the left lane when he was rear-ended by Brewer, was contradicted by objective facts and so internally inconsistent and implausible on its face that a reasonable juror would not credit the story. Jackson testified at trial that he felt a "tremendous jolt" on impact and that his 18-wheeler was pushed forward, but defendants conceded (by virtue of a request for admissions) that on the date of the accident, Jackson told a Hunt representative he had no idea he had been hit until a person ran up to him and said "there's a truck under yours." Hunt's own expert testified that it was not possible for the 18-wheeler to have been pushed forward by Brewer's much lighter pickup truck. In addition, Jackson testified the lane line he crossed was a dotted white line; whereas the accident scene photographs show it was a solid white line. When confronted with the accident scene photographs, the LeBlancs acknowledged the 18-wheeler was not completely in the left lane of travel and that from their vantage point directly behind the 18-wheeler, they could not tell if the 18-wheeler was stopped or moving when they observed it.
The photographs of the accident scene demonstrate the line dividing the lanes was a solid white lane line, which demands extreme caution in crossing.[17] Given Jackson's admission that he drastically slowed *244 his speed once he began to move the 18-wheeler across the lane line into the left lane of traffic, his admission that he did not check his left mirror in the three seconds before the collision and did not at any time observe Brewer's approaching truck, and the failure of any witness (other than Jackson) to testify that a turn signal had been activated, it is clear Jackson moved into the left lane without due regard for following vehicles. And, by blocking both lanes of travel, Jackson created a hazardous situation for approaching vehicles. Although Jackson indicated it was necessary that he vacate the right lane at the time he did, the uncontradicted evidence reveals the phasing out of the right lane did not commence for another 2½ miles.
Because the duty of a motorist changing lanes on a multiple lane highway to ascertain before attempting the maneuver that it can be made safely without endangering oncoming traffic encompasses the risk that a premature maneuver will result in exactly this type of accident, we find the jury was clearly wrong in failing to assign any fault for the accident to Jackson.
Jackson's fault notwithstanding, we find the jury was neither clearly wrong nor manifestly erroneous in concluding that Brewer bears some responsibility for the accident. The testimony of Amy and Shelton LeBlanc establishes Brewer did not apply his brakes until seconds before the accident. The jury could have reasonably credited this testimony and concluded Brewer was negligent in failing to keep a proper lookout and react timely.
Given our conclusion that the jury was clearly wrong in failing to assign any fault to Jackson, we must adjust the allocation of fault. In doing so, we remain mindful of the admonition of Clement v. Frey, 95-1119, 95-1163, pp. 7-8 (La.1/16/96), 666 So.2d 607, 611-after an appellate court finds a "clearly wrong" apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trier of fact's discretion. In determining the highest or lowest percentage of fault that could reasonably be assessed under the facts of this case, we are guided by the factors set forth in Watson v. State Farm Fire & Casualty Insurance Co., 469 So.2d 967 (La.1985). In Watson, we noted "various factors may influence the degree of fault assigned," including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste without proper thought. Id., 469 So.2d at 974.
Applying these factors to the instant case, we conclude Jackson and Brewer each bear a degree of responsibility for the accident. As regards Brewer, the evidence suggests he was not sufficiently attentive to the actions of the motorists preceding him on the highway and failed to appreciate and react in time to the merging traffic. This conclusion is supported by the testimony of the LeBlancs indicating Brewer had ample time to observe the 18-wheeler enter his lane and yet failed to slow down, waiting until a second or two before the collision to brake, and by the physical evidence suggesting that rather than slow down, Brewer initially steered to the right, ostensibly attempting to pass the 18-wheeler on the right, but misjudging its speed. On the other hand, the objective physical evidence suggests Jackson, a professional truck driver, was not entirely without fault in the accident. Despite his *245 training and his ability to discern from his high vantage point whether he could safely and promptly complete his lane change before moving out of his lane of travel, he initiated the maneuver without signaling and without sufficient space and momentum to complete the maneuver, thereby occupying both lanes of traffic and forcing approaching motorists to adjust to him.
Charged with establishing the high/low range of fault attributable to these negligent actors that would constitute a reasonable conclusion by the trier of fact, and with deference to the jury's conclusions, we find the jury was clearly wrong to assess Jackson and his employer, Hunt, with no fault, and that Jackson's fault was not less than 30 percent, but no more than 50 percent. Accordingly, we increase the fault of Jackson and Hunt to 30 percent, which is the lowest amount the jury could have reasonably allocated to these defendants.
Neither party assigns error to the amount of the damages assessed by the court of appeal. Consequently, we affirm that amount.

CONCLUSION
For the foregoing reasons, we affirm the decision of the court of appeal insofar as it finds both plaintiff, Brewer, and defendants, Jackson and Hunt, at fault with regard to the accident at issue. However, we reverse regarding the percentages of fault of the parties. Brewer is determined to be 70 percent at fault and Jackson and Hunt are 30 percent at fault. In all other respects, the judgment of the court of appeal is affirmed. The case is remanded to the district court to confect an appropriate monetary judgment based upon the fault percentages and the gross damages awarded.
REVERSED IN PART; AFFIRMED IN PART; REMANDED.
VICTORY, J., dissents and assigns reasons.
GUIDRY, J., concurs in part, dissents in part, and assigns reasons.
VICTORY, J., dissenting.
I dissent from the majority opinion because I am not convinced that the jury committed manifest error in deciding the defendant was not at fault in this accident. The jury heard the following testimony from Shelton and Amy Leblanc, who were trailing the plaintiff on the interstate for several miles before this accident:
SHELTON LEBLANC:
Q: Did you see the blue pickup truck at any time before it struck the eighteen wheeler?
A: Yes, I got on Interstate 12 at Sherwood Forest. We were heading towards Hammond and me and that little blue truck, as I got on the interstate we were kind of going through traffic together and as I-12 narrowed to two lanes at O'Neal he went around me and was in front of me where he stayed until the accident.
Q: Did you ever lose sight of the blue pickup truck
A: No.
Q: From that point up until the accident?
A: No sir.
Q: How far away from the eighteen wheeler were you when you first saw it?
A: Probably a quarter to a half mile.
Q: What lane were you in at that point?
A: The left.
Q: What lane was the eighteen wheeler in?

*246 A: The left.
Q: Was the eighteen wheeler moving?
A: It didn't appear to be.
* * *
Q: How much time would you say went by from when you first saw the eighteen wheeler and when the collision occurred?
A: Probably about twenty seconds.
Q: And what was going on during those twenty seconds?
A: I was driving on interstate, I had cruise set. Whenever I saw the truck ahead was stopped I touched my brakes so the cruise would turn off and started coasting down and noticed that the truck in front of me had kept his speed because he was still, the gap between us was getting bigger. And I don't know I guess me and Amy talked about it, you know, look he's not stopping, he's not stopping. He just didn't stop.
Q: Did [] Mr. Brewer in the blue pickup truck apply his brakes at any time before impact?
A: He did apply his brakes. I mean it all happened, whenever his brake lights come on maybe a second or so later, he hit the truck.
Q: During the approximate twenty seconds that you observed Mr. Brewer continuing toward the rear of the tractor trailer, did you see the tractor trailer make any leftward movement?
A: No.
Amy Leblanc also testified as follows: AMY LEBLANC:
Q: Alright, you say there were cars stacked up, where were they?
A: They were all in front of the eighteen wheeler. There was no one behind the eighteen wheeler.
Q: So was he [the Hunt driver] like a car length or two behind the vehicle in front of him?
A: Um-hum, yes.
Q: Well from that point forward just tell us what happened from the point you first see the eighteen wheeler until the collision occurs.
A: Okay we were probably an eighth of a mile behind the blue truck. And we had our, my husband had the cruise set. When he noticed the cars up ahead stopped he disengaged cruise. We had plenty of enough time to coast down from cruise. We didn't have to hit our brakes. But we noticed the blue truck wasn't stopping. You could tell he was maintaining the speed. He wasn't slowing down or anything, no brakes or anything up until maybe a second before he hit the truck he did hit the brakes.
Q: Was there any discussion between you and your husband during that period of time?
A: Yes, we probably about three times said, "He's not going to stop, he's not going to stop." And then you know, "Oh my god, he's not stopping." And that's when he hit him.
Apparently, the jury believed this testimony, which is not inconsistent with the accident photographs.
Based on the photographs and the Leblancs' testimony, the cab of the 18-wheeler was in the left-hand lane and its trailer was almost in the left-hand lane when the accident occurred. The plaintiff was clearly driving too fast under the circumstances and simply ran into the back of the 18-wheeler that was almost completely stopped. The plaintiff steered toward the *247 right lane to avoid the truck, but was unsuccessful and then steered back into the rear of the truck as he continued to skid. While the majority points out some inconsistencies in the truck driver's testimony, the jury heard those inconsistencies and nonetheless rendered a verdict placing all of the blame for this accident on the plaintiff, apparently accepting the substance of the Leblancs' testimony. Therefore, it was not manifestly erroneous for the jury to place no fault for this accident on the truck driver. This very day, our court has correctly stated the law on manifest error:
We understand and appreciate the reality that many times we would have judged the case differently had we been the trier of fact, but this is not our function as a reviewing court. A reviewing court cannot disturb an award because it would have judged the case differently. The manifest error doctrine is not so easily broached. Rarely do we find a reasonable basis does not exist in cases with opposing views. We note it is not hard to find a reasonable basis for a finding, which makes the manifest error doctrine so very difficult to breach, and this is precisely the function of the manifest error review. A reviewing court has only the "cold record" for its consideration while the trier of fact has the "warm blood" of all the litigants before it. This is why the trier of fact's findings are accorded the great deference inherently embodied in the manifest error doctrine. So once again we say it should be a rare day finding a manifest error breach when two opposing views are presented to the trier of fact. Shannon Menard et al. v. Lafayette Insurance Company et al., 09-1869, p. 21-22, 31 So.3d 996 (La.3/16/10) (emphasis original).
For the above reasons, I respectfully dissent.
GUIDRY, Justice, concurs in part, dissents in part, and assigns reasons.
While I concur in the majority's finding that the court of appeal erred in conducting a de novo review of the record, I dissent from the majority's conclusion that the jury manifestly erred in its allocation of fault. During the two-week trial, the jury heard the argument and testimony presented by both sides. The jury apportioned the plaintiff 100% fault based upon the evidence and its assessment of the witnesses' credibility. After careful consideration, I find that its ultimate determination is supported by the evidence and entitled to deference.
NOTES
[1] Kimball, C.J., did not participate in the deliberation of this opinion.
[2] Duncan v. Kansas City Southern Railway Co., 00-0066, p. 11 (La. 10/30/00), 773 So.2d 670, 680-681.
[3] In addition, Brewer sustained, among other injuries, more than fifty facial fractures, a right femur fracture, a tear of the spleen necessitating removal of the spleen, two tears to the colon, a finger joint fracture, left elbow fracture and nose fracture. He was hospitalized for approximately thirty days in a comatose state, assisted by an artificial ventilator and feeding tube. Since the accident, Brewer suffers from uncontrolled facial twitching, heterotopic ossification in the left elbow which prevents him from straightening his arm, and arthritis in his left elbow, right thumb, and left little finger.
[4] By order dated January 9, 2006, James C. Dewey, duly appointed curator of Brewer's property, financial and legal affairs, was substituted as party plaintiff for Brewer.
[5] The court of appeal did not address the liability of the other defendant to this action, the State, having found the claims against the State had been abandoned for purposes of the appeal. Brewer, 08-1666 at 4 n. 3; 9 So.3d at 938 n. 3
[6] On Brewer's application for rehearing, the judgment was amended to award legal interest from the date of judicial demand.
[7] Defendants sought supervisory review of the district court's ruling on the motions in limine in the Court of Appeal, First Circuit and this court. Both courts refused writs, declining to exercise supervisory jurisdiction over the interlocutory ruling. Brewer v. J.B. Hunt Transport, Inc., 05-2371, 05-2643 (La.App. 1 Cir. 12/29/05)(unpublished), writ denied, 06-0018 (La.1/5/06), 918 So.2d 1018.
[8] On the advice of his treating physician, Brewer, who has no recollection of the accident and whose intellectual and emotional impairments make him an unreliable witness, did not testify. As a result, his mother became a key fact witness.
[9] Porche explained the accusation arose after the foreman on the job told Brewer he could have the scrap metal in the dumpster.
[10] "GHB" is gamma hydroxy butyrate. Although commonly referred to as the "date rape" drug, there was no evidence introduced advising the jury of this.
[11] In his closing argument to the jury, defense counsel stated:

Now what did we hear in terms of damages? I told you in the opening statement that I suspected because I had heard right before the trial was going to start that Mr. Smith wasn't going to bring Mr. Brewer to this trial. I find that relatively amazing, but sure enough he never did bring him so I did the only thing I could do for you. I played part of his video taped deposition.. . . They paint this picture throughout as Mr. Brewer being essentially an invalid and now he's got to be put in an institution for the rest of his life. That's not the gentleman that I saw and heard when I saw him on his video tape. . . . You do hear that the man has continued to live his life in that he's still going out with his friends as recent [sic] as six months after the accident. . . . The complaint as I heard it most from Mrs. Porche is that yes, but now he's hanging out with unsavory characters doing unsavory things. Well, he was hanging out with those same guys before this accident happened. You said that he made a 1.66 that last semester because he quit going to class. Why? he said, Well I don't know, I just don't know. I had other things to do. He had already started down that path. He'd started hanging with these same guys that his parents don't approve of him hanging out with and he started doing the same unsavory things. So if in fact Mr. Brewer and I don't believe it to be fact, but if in fact it is that he is the person that the plaintiff would like you to believe that he is now, I don't think it's because of this brain injury. Sure that might play some part of it, but I think it's probably a continuation of hanging out with the unsavory guys doing the unsavory things in a lifestyle choice that he made.
[12] Steve Jackson is no relation to the driver of the 18-wheeler, Robert E. Jackson.
[13] In support of the appeal court's decision that a de novo review of the evidence was warranted, Brewer argues that the fact-finding of the jury was further interdicted by erroneous jury instructions. Specifically, Brewer argues the district court erred in instructing the jury there is a presumption of fault against a rear-ending vehicle under LSA-R.S. 32:81, because the presumption does not apply in a lane change case. Further, Brewer maintains once the district court improperly instructed the jury as to the rear-end presumption, it was error for the court to refuse the instruction that a motorist changing lanes on a multi-lane highway has a duty under LSA-R.S. 32:104 to use a turn signal to alert following motorists. This precise argument was raised in the court of appeal and rejected. Brewer, 08-1666 at 6-9; 9 So.3d at 939-941. As that court pointed out, there were factual issues raised at trial as to whether Jackson had completed his lane change at the time of impact and whether Brewer was alert and attentive and proceeding in his lane at a lawful speed. The instructions delivered by the court set forth the legal presumptions that potentially weighed in favor of and against each of the two drivers. It was left to the jury to determine which presumption, if any, was applicable under the facts and circumstances of this case. As did the court of appeal, we find, after a reading of the instructions in their entirety, that those instructions "`adequately provide[d] the correct principles of law' and did not mislead the jury `to the extent that it was prevented from dispensing justice.'" Adams, 07-2110 at 10, 983 So.2d at 806, quoting Nicholas v. Allstate Insurance Company, 99-2522, p. 8 (La.8/31/00), 765 So.2d 1017, 1023. Therefore, because we find no error in the jury instructions warranting de novo review, we remain firm in our conclusion that the jury's liability determination is subject to review for manifest error.
[14] At trial, Brewer alleged the accident was also caused by the negligence of the State in failing to respond after a prior similar accident at almost the same location only two days earlier and to post signs that were adequate in number, placement, and specificity to alert motorists of a construction zone and that rapid slowdowns could occur. After the jury returned its verdict exonerating the State from negligence, Brewer filed a protective appeal against the State, reserving the issue of the State's liability for consideration only in the event that another party raised the issue. Because no other party asserted the liability of the State, the court of appeal considered the issue abandoned and did not address it. Brewer, 08-1666 at 4, 9 So.3d at 938 n. 3. Brewer has pursued a similar course of action in this court, filing a writ alleging, as a protective measure and only in the event that the issue of the State's negligence is raised, that the jury erred in finding the State was free of fault. Brewer v. J.B. Hunt Transport, Inc., 09-1428 (La. 10/16/09), 19 So.3d 465. Because no party has briefed the issue of the State's liability, including Brewer who maintains the judgments below are correct insofar as they absolve the State of liability, we will also consider the issue abandoned.
[15] While it is true that under the jurisprudence, a presumption of negligence generally applies to a following motorist in a rear-end collision, Mart v. Hill, 505 So.2d 1120, 1123 (La. 1987), because the following motorist in this case is the plaintiff, who already bears the burden of proof, the burden-shifting effect of the presumption is rendered moot. Cheairs, 03-0680 at 15, 861 So.2d at 545.
[16] Steve Jackson's testimony was corroborated by the testimony of Michael Ricca, an employee of the State, Department of Transportation and Development.
[17] The Louisiana Driver's Guide provides, with respect to lane markings:

Single Solid White Lines indicate that movement from lane to lane is hazardous. The wider the line, the greater the hazard. You may cross a solid white line only with great care.
Louisiana Department of Public Safety and Corrections, Louisiana Driver's Guide Classes "D" and "E" (1/09).