DREW, J.
| plaintiffs, William Lane Stephenson, III, et al. (“Stevenson”), appeal from a judgment dismissing their action for in-junctive relief and money damages against defendant, Wildcat Midstream Caddo LLC (“Wildcat”). We affirm.
Plaintiffs are the record owners of the NW quarter of the NW quarter of Section 11, Township 14N, Range 7W in DeSoto Parish. Double R Farms, LLC (“Double R”), is the record owner of the NE quarter of the NW quarter of the same Section. Double R acquired title to this property in 2008,[1] and is not a party to this dispute.
In 2012, Wildcat informed both Stephenson and Double R that it desired to build a pipeline on a portion of the property. Wildcat ultimately constructed the pipeline, which ran north-south, down the western edge of the NE quarter of the NW quarter. Because Double R was the record titleholder of that property, Wildcat negotiated with and bought a right-of-way agreement from Double R, not Stephenson. During construction of the pipeline, Wildcat cut the timber along the servitude.
In November 2012, Stephenson filed suit against Wildcat. Plaintiffs alleged that, despite what the public records show:
• they were the owners of a three-acre strip of land on the western side of the NE quarter of the NW quarter;
• they owned this property by acquisitive prescription due to adverse possession of the property for more than 30 years;
• Double R knew that it did not own this strip of land because the 1993 deed transferring the property to its predecessor in title contained the following language:
12“The parties acknowledge that a portion of the property herein is sold without any warranty whatsoever ... that non-warrantied property being described as follows:
“A strip of land one hundred (100') feet wide across the North[2] side of the Northeast Quarter (NE 1/4) of the Northwest Quarter (NW 1/4) Range 13 West, DeSoto Parish, Louisiana, containing three acres, more or less, and leaving 37 acres....” (emphasis added); and
• Prior to construction of the pipeline, Stephenson told Wildcat’s landman, Jason Dixon, that Stephenson was *528 the owner and Dixon had originally negotiated with Stephenson, not Double R.
In their petition, plaintiffs asked the court to grant them a permanent injunction ordering Wildcat to remove the pipeline from the plaintiffs’ property, money damages for removing the timber, and attorney fees. The plaintiffs filed an amended petition alleging that after the first suit was filed, Wildcat caused the removal of additional timber and fencing from the plaintiffs’ property. Plaintiffs alleged that these actions amounted to the intentional destruction of evidence and sought additional damages for spoliation of evidence. Wildcat answered the petitions generally denying wrongdoing and urging that plaintiffs’ petition had only vaguely described the strip in question.
After discovery and an unsuccessful motion for summary judgment by defendants, the case went to trial in November 2015. Plaintiffs’ position at trial was that they, not Double R, were the owners of the three-acre strip where the pipeline was located. Wildcat raised several defenses:
• Wildcat was entitled to rely on the public records doctrine to determine whom to pay for the right-of-way, and because Stephenson’s claim to the land was not recorded, it correctly paid Double R, not Stephenson;
[¾* Stephenson cannot prove acquisitive prescription of the property because the fence they rely on was built by the previous owner of the NE section and was not the western boundary of the NE section; and
• Even if Stephenson had obtained ownership of the strip by acquisitive prescription, Double R had reae- ■ quired ownership by 10-year acquisitive prescription when its predecessor in title obtained record title to the property and rebuilt a boundary . fence in 1993 or 1994.
A large number of photographs of the property,-both historical and modern, were admitted into evidence. The court heard extensive testimony from plaintiffs’ witness Randall Grip, vice-president of Aero-Data Corporation and an expert in photo interpretation and photogrammetry, the taking of measurements from photographs. Grip testified:
• The USGS topo map of the area, created from aerial photos taken in 1974, has a fine red dash line showing a single fence dividing the NW and NE quarters. The fence does not run vertically down the quarter section line but, for much of its length, runs diagonally and encroaches onto the NE quarter;
• This encroachment encompasses the disputed strip;
• A 1959 aerial photo of the property also shows only a single fence that is, largely, not on the quarter section line and that encroaches onto the NE quarter;
• Close examination of the photo with special equipment did not reveal evidence of any fencing on the quarter section line;
• Likewise, an aerial photo of the property taken in 1974 revealed no evidence of any fence on the quarter section line; the only visible fence was the one that encroached onto the NE quarter enclosing the strip for use by the NW quarter;
• Neither the 1959 nor the 1974 photo showed any evidence that there was any enclosure of the strip between its eastern edge and the quarter section line;
• A February 2004 aerial photo showed the strip area in the NE quarter planted with trees, and these *529 trees were also planted in the NW quarter; and
f The tree growth by 2004 prevented observation of whether there was a fence built on the quarter section line to separate the NW quarter from the NE quarter.
Plaintiff William Stephenson, III, testified:
• His father acquired the NW quarter of the NW quarter in the 1980s and later donated the property to him;
• When he initially walked the property at the time his family acquired it, there was only one fence dividing the NW quarter property from the NE quarter property, and that fence encroached onto the NE quarter. This fence was “a net wire fence that was grown into the trees, maybe three foot tall with two strands of barbed wire above it ... ”;
• This fence effectively made the strip of the NE quarter a part of the Stephenson property;
• There was no fence, and no evidence that there had ever been a fence, along the quarter section line dividing the NW quarter from the NE quarter;
• In 1986, with assistance from the Department of Agriculture, he planted pine trees both on the strip and on the adjoining property in the NW quarter;
• In June 2012, landman Jason Dixon approached him about acquiring a right-of-way across the property for a pipeline;
• Stephenson told Dixon that “someone had put a fence inside mine to the west of mine, but because of adverse prescription it was there when we bought it and it was our understanding that we had purchased that piece of land also”;
• About a month later, Dixon informed Stephenson that the pipeline would be run entirely on Reggie Roe’s land but that “they would do their homework and due diligence and try and pay the proper land owner of that section of land”; and
• In early September, Wildcat moved heavy equipment onto the NE quarter and cleared an area to the east of the section' line. When Stephenson complained to Dixon about this, Dixon “wanted to know how much it was going to cost us ... for the damages to our property.” Dixon then referred Stephenson to Dixon’s boss, Hayden Havens, who told Stephenson that “they were looking into it and they would take care of us.” However, Wildcat never paid Stephenson anything; Havens told Stephenson that “they [Wildcat] would take their chances in Rcourt.” Stephenson had the missing trees appraised; their value was $8,110.32.
In support of his testimony that the strip area had been fenced for more than 30 years, Stephenson offered the expert testimony of Dr. Richard Keim, a forester, who opined that the wire had become embedded in the supporting tree in roughly 1963 and was probably attached to the tree a year or two prior to then. An expert in barbed-wire fencing, Dan Sowle, opined that the wire had been in place between 60 and 80 years prior to 2013. Forester Timothy Holland testified that he helped plant the trees on the strip in 1984 and, at that time, there was only one fence on the property and he planted the trees up to that fence. Terrell Brown, a local resident who grew up hunting on the property, testified that there had been only one fence in the area and that there had never *530 been a fence to the west of the fence that enclosed the strip.
Another local resident, William Pru-dhome, said that his grandparents owned the NE quarter of the NW quarter (now the Double R property) and that he grew up on the property in the 1960s and 1970s until 1982 when his grandparents died. He explained that there had been only one fence dividing the eastern and western quarters and it was the fence that enclosed the strip for the NW quarter. Prudhome said that he was present in 1962 or 1963 when his grandparents rebuilt this fence because it was old and worn out. He also testified that the strip of land between this fence and the quarter section line had never been enclosed.
Reggie Roe, one of the principals of Double R Farms, testified for the defendant. Roe said:
• He and his wife Susan bought the NE quarter of the NW quarter on October 4,1993;
li* Roe grew up “a mile and a half up the road” from the subject property and knew William Prudhome’s grandfather, Howard Prudhome, and his wife, Jewel. Roe said that as a child, he helped at Prudhome’s dairy barn;[3]
• After Howard and Jewel died, their daughter Frances Clotese Baker and her husband Tommy moved onto the Prudhome property. The Bakers held a rodeo on the property every Saturday night, and Tommy Baker bought and sold Roe’s cows for years;
• There had always been a fence on the section line dividing the NW quarter from the NE quarter. The corner posts were made from cross ties or telegraph poles and the other posts were “just wood posts.” The wire used was a four-strand barbed wire. Roe identified a recent photo of himself next to one of the old telegraph poles that supported the section line fence and testified that the location was the southeast corner of the NE 1/16 section. Roe had other photos of barbed wire that he identified as the remnants of the old section line fence;
• The area of the strip was used for a hog pen by the Prudhomes.[4] The edges of the hog pen were enclosed by a “net wire” fence. This wire was attached to the section line fence on the west side and to trees on the east side;
• In October 1993, the same month he bought the NE quarter, Reggie Roe and some of his farm hands rebuilt the north-south fence on the section line between the NE and NW sections. They used some new wire and “tied it back together where the trees and stuff had fell across it.” This fence was along the same line where Howard Prudhome’s fence had been. The telegraph pole fence post in the photo of the old boundary line fence is only a few inches to the west of the fence that Roe built in 1994;
• The following year, the Roes built all new perimeter fencing. The western edge of this new fence, made from modern T-posts and wire, is exactly on the north-south section line between the NW and NE sections. Photos of this fence were admitted into evidence. The plaintiffs never complained about this fence or filed *531 any action claiming ownership of the strip to the east. The Roes, not the Stephensons, had paid the property taxes on the entire NE section; and
• The part of the property the Roes bought without warranty was the “northeast corner” of the section where Henry and Eleanor Lee— cousins of the Prudhomes — lived. There was no lack of warranty for |7the property on the western edge of the NE section. However, Roe admitted that the property where the Lees lived was in Section 2, not Section 11.
The record shows that Stephenson was well aware of the fence built by Roe in the 1990s:
Q: Reggie’s fence — you know for a fact that Reggie’s fence was built, or replaced, or whatever, in ’94 or ’95, that mid-ninety time frame?
A: I — yes. A friend of mine actually had to show it to me because it was in such thick young pine trees you couldn’t visible [sic] see it unless you walked in there.
[[Image here]]
Q: ... You first knew about it when Mr. Hornbuckle advised you about it?
A: He had to go show it to me.
Q: Yes, sir. He told you about it in 1994 or 1995?
A: Correct
Q: You learned about Reggie’s fence in 1994 or 1995?
A: Correct.
Q: You personally went out there and laid eyeballs on it in 1994 or 1995?
A: Correct.
Q: You didn’t think much about it when you saw it, did you?
A: I thought nothing about it because our fence with [sic] the boundary line when we bought it, and I thought that was ours and because it had been there so long that was our property and I didn’t think anything about it.
A friend of Roe’s, Johnny Pearce, testified about the original fencing. Pearce said that he worked on the old Prudhome farm (now the Double R property) from when he was a child until 1966 or 1968, when he left the area. Pearce said that he helped build a hog pen on the property. Pearce testified that there was originally a fence on the western side of the farm and | sthat the hog pen fence tied into that fence. He said that the boundary fence “originally was a barbed wire, but I think somebody prior to me, I don’t know who, had added the hog wire fence on the bottom of it.” Pearce also said about the perimeter fence that “some of it was not maintained a lot ... with trees and stuff, but there was always a fence there. In the early days, there was a good fence.”
After hearing all the witnesses, the trial court ruled in favor of Wildcat, stating:
Mr. Ayres,[5] the ruling is exactly what you said. 1993 there was a disturbance in law when the deed was recorded. There was a disturbance in fact when the fence was built. Mr. Stephenson had full knowledge of it. Had I known that in summary judgment, I would have granted it. Case dismissed at the plaintiffs costs.
The plaintiffs now take this devolutive appeal.
DISCUSSION
On appeal, the plaintiffs argue:
• The trial court erred by failing to hold that Stephenson owned the *532 strip by virtue of acquisitive prescription of 30 years;
• The trial court erred by stating that alleged “disturbances” in law and fact that occurred after Stephenson acquired ownership of the strip somehow caused Stephenson to lose ownership of the strip; and
• The record does not support a finding that Roe obtained ownership of the strip by acquisitive prescription of 10 years because (1) Roe did not possess in good faith, (2) Roe’s alleged possession was clandestine and (3) Roe did not possess by just title.
Thus, plaintiffs argue, the trial court erred by not awarding damages to Stephenson.
This court reviews factual findings under the manifest error standard, Stobart v. State, through Dept. of Transp. & Dev., 617 So.2d 880 (La.1993), while legal issues are reviewed de novo. Brewer v. J.B. Hunt Transport, Inc., 2009-1408 p. 9 (La. 3/16/10), 35 So.3d 230.
This case was not instituted as a posses-sory or a petitory action. The plaintiffs sought money damages for timber trespass and injunctive relief. Although the plaintiffs did not formally demand a judgment declaring them the owners of the property, this court has previously said that proof of ownership is essential in a timber trespass case. Bennett v. Louisiana Pacific Corp., 29,598 (La.App. 2 Cir. 5/9/97), 693 So.2d 1319, writ denied, 97-1552 (La. 10/3/97), 701 So.2d 199. In Bennett, unlike in this case, the alleged trespasser defendant asserted its own claim of ownership of the property at issue. In the instant case, this court requested supplemental briefs from the parties on the question of whether Double R was an indispensable party under these circumstances, and both Stephenson and Wildcat urged that it was unnecessary to add Double R as a defendant. We agree with the parties that a complete adjudication of this appeal does not require the presence of Double R.
For purposes of this discussion, we will assume that the plaintiffs’ argument about 30-year acquisitive prescription is true. The trial court made no explicit finding of fact about that issue but concluded, as do we, that events occurring after Stephenson may have acquired ownership of the property ended the Stephensons’ rights to the relief they sought, regardless of their prior ownership of the property.
The Roes purchased the NE 1/16 section in 1993. Their title conveyed to them the NE quarter of the NW quarter of the section. The only irregularity in the conveyance was the sale without warranty of a “strip of land one hundred (100') feet wide across the North' side of the Northeast Quarter (NE 1/4) of the Northwest hoQuarter (NW 1/4), Range 13 West, De-Soto Parish, Louisiana, containing 3 acres, more or less, and leaving 37 acres, more or less.” Although this description does not include the section number, the context makes it clear that it applies to the Section 11 property at issue. However, no context is necessary to interpret the language that places the “without warranty” property at the north of the 1/16 section rather than at its west. At any rate, the seller conveyed to the Roes whatever interest she had in the subject property.
Even without Roe’s testimony that he immediately rebuilt or repaired a fence on the quarter section line in 1993, the testimony of Mr. Stephenson establishes that Roe had built a modern fence down the north-south quarter section line by 1995 at the latest. Thus the strip was fenced into the NE quarter of the NW quarter for at least 17 years before this dispute arose, and this record reveals no disturbances in law or in fact during that time. For all of that time, the Roes and/or Double R, not *533 Stephenson, paid property taxes on the strip as well.
La. C.C. art. 3473 provides:
Ownership and other real rights in im-movables may be acquired by the prescription of ten years.
La. C.C. art. 3475 provides:
The requisites for the acquisitive prescription of ten years are: possession of ten years, good faith, just title, and a thing susceptible of acquisition by prescription.
The trial judge’s brief reasons for judgment show his conclusion that Stephenson’s interest in the property had been extinguished by acquisitive prescription. In his reasons, the trial judge referred to the argument of defense counsel, and we reproduce that here for posterity and in support of In this court’s choice not to conduct a de novo review based solely upon the brevity of the trial court’s reasons:[6]
[Tjhere’s no proof that anyone ... possessed adversely to Reggie Roe and I’ll tell you why. When Reggie Roe bought this property, he built — when he bought the northeast of the northwest, he — one of the first things he did was he went back and repaired the actual boundary fence and fenced Mr. Stephenson out and Mr. Stephenson knew it because he went and looked at it and for eighteen years he never said a word. He didn’t say anything about the boundary fence. Hey, Mr. Roe, you’ve fenced me out, I need to file a possessory action. I need to file a petitory action. Nothing. No proof at all. And he did not possess adversely against Mr. Roe because within months or so after buying that property, he rebuilt the actual boundary fence and fenced him out of the area of where the pipeline is covered. Plaintiffs’ point being, Your Honor, plaintiffs can’t carry their burden of acquisitive prescription because Roe is clearly the owner. ...
Even if public records doctrine doesn’t control and even if somehow or another they got by acquisitive prescription over thirty years because of the hog fence that was built by Mr. Prudhome, not the owner of Stephenson’s predecessor in title but by the predecessor in title to Mr. Roe. Even if that somehow counts, the fact of the matter is Mr. Roe got it back by acquisitive prescription. And what I mean by that is, when Mr. Roe, even if he had lost it which he didn’t, but even if he had, when he goes back and rebuilds this boundary fence in 1993 or ’94 and fences Mr. Stephenson out and Mr. Stephenson knows about it, ten years acquisitive prescription under Article 1375, he had title and his deed is in the record ..., he had record title to the northeast quarter of the northwest quarter. He had record title and he had possession of it by way of a fence for over ten years, so he got it back by 2003 or 2004.
We conclude that Roe/Double R satisfied all of the requirements of La. C.C. art. 3475 and thus the plaintiffs failed in them burden of proving ownership of the disputed strip in 2012. The property was plainly a thing susceptible of acquisition by prescription, and the 1993 deed conveying the property to the Roes was just title;[7] as noted, the “without warranty” provision referred to a strip on the north, not on the west, of the property. |1aWe also reject Stephenson’s contention that Roe’s/Double R’s possession of the *534 property was not public per La. C.C. art. 3476; the fence built by Roe was of a type in common use and Stephenson was actually aware of the fence by 1994 or 1995.
The plaintiffs’ principal objection to Double R’s acquisition of the property by 10-year acquisitive prescription is their argument that Roe’s possession of the property was not in good faith. La. C.C. art. 3480 provides:
For purposes of acquisitive prescription, a possessor is in good faith when he reasonably believes, in light of objective considerations, that he is owner of the thing he possesses.
Plaintiffs point to the evidence that Roe said he knew of a fence in the trees on the strip and further that Roe obviously knew that there was a sizable pine forest on the strip. Roe maintained that there were two fences through the trees, one of which was the quarter section line boundary fence, and he supplied the court with photos depicting old fencing that he asserted was the remains of the original section line boundary fence. At trial, Roe also read from a 1985 survey that describes what appears to be the subject property as “grown up in hardwood brush and briars.” Although the plaintiffs assert that Roe knew of the presence of “posted” signs on the hog wire fence to the east, our review of Roe’s trial testimony does not reveal that he made any such statement. Although the trial judge did not make an explicit finding of fact about Roe’s good faith, our review of the record as a whole reveals nothing that would present a reversible error in the trial court’s conclusion that Stephenson failed to prove that they owned the property in 2012.
| ^Because the trial court correctly concluded that the plaintiffs failed to carry their burden of proof to obtain the relief sought, at appellants’ cost, the judgment of the trial court is affirmed.
AFFIRMED.
CARAWAY, J., dissents with written reasons.

. Double R’s predecessors in title were Reggie and Susan Roe, who are the members of Double R. The Roes acquired the property from a third person in 1993.

. The deed specifies that the strip sold without warranty is on the north side of the Double R property. The strip in question in this case is on the west side of the Double R property.

. William Prudhome disputed this, saying, "As long as they (his grandparents) were living, Reggie Roe never been on that property.”

. William Prudhome disputed this assertion.

. Mr. Ayres was counsel for Wildcat.

. In addition, this case was exceptionally well tried and argued by both sides.

. See generally, Ryan v. Lee, 38,352 (La.App. 2 Cir. 4/14/04), 870 So.2d 1137, writ denied, 04-1531 (La. 10/1/04), 883 So.2d 991.